CARAWAY, J.
| ¶ This case involves the chicken breeder contract between a breeder farmer and a large chicken manufacturing company which was the subject of this court’s prior opinion in Volentine v. Raeford Farms of La., L.L.C., 48,219 (La.App.2d Cir.7/24/13), 121 So.3d 742, writ denied, 13-2493 (La.1/17/14), 130 So.3d 948 (“Volentine I ”). Upon remand of the case and trial, the trial court determined that the company had terminated the plaintiffs’ breeder contract in bad faith, violating the terms of the contract and the Louisiana Unfair Trade Practices Act (La. R.S. 51:1405) (hereinafter “LUTPA”). The court awarded damages for, among other things, plaintiffs’ loss of income, the loss of the family farm and mental anguish. The defendant company appeals the trial court’s ruling on the contract termination and the damages awards. We affirm in part and reverse in part.

Facts

Facts of this case can be found in our previous consideration of the parties’ contract in Volentine I, supra. After remand, the case proceeded to a bench trial. The following chronology and overview of facts are set forth for purposes of the issues raised on appeal.
The Parties’ Entry into the Contract— 200b
In 1992, Dan Volentine (“Volentine”) gave his two children property for the purpose of building four breeder houses.[1] In the late 1990s Dan and his wife Dianne managed these farms because their children both held jobs. At that time, Raeford Farms was not the integrator for the area. By 2002, Dan’s son desired to go into the broiler side of the business. To that end, Dan gave his son more land to build broiler houses, and Dan and Dianne purchased the breeder house property from their children in 2002. The Volentines’ debt by 2002 was $1,361,511.
On January 20, 2004, Volentine entered into two hatching egg production contracts (hereinafter the “Contract”) with Raeford *333 Farms of Louisiana, LLC (“Raeford”), covering two units containing two houses each (two farms). Under the Contract, Raeford furnished breeding hens, feed and medication and agreed to provide technical advice, catching and marketing, feed delivery and egg pick-up. The trial court’s opinion recognized that “at all times pertinent, Raeford was essentially Volentine’s only source of supply of chickens.”
Under the Contract, Volentine agreed to provide, at his cost, all labor, utilities, litter and supplies and to “provide housing and equipment well maintained and fully equipped as required by Company specifications.” Additionally, Volentine agreed to “cooperate with the Company in adopting and/or installing new proven management practices and equipment,” and to “properly dispose of dead birds, manure and poultry litter in accordance with government regulations and Raeford Farms of Louisiana, LLC, recommendations:”
The specific events of default under the Contract included, “failure of the Producer to properly care for and protect any of the Company’s property,” “the occurrence of any event which in the opinion of the Company endangers or impairs the Company’s property,” “failure of the | ¡¿Producer to comply with any provision of this contract,” and “failure of the Producer to consistently produce hatching eggs in an efficient competitive manner.”
The trial testimony revealed that Volen-tine received 32<f per dozen for the eggs produced. The Contract additionally contained provisions for “hatchability” and “feed conversion” bonuses paid by Raeford after the flocks were sold. These bonuses were calculated on a 36-week period and provided working capital for the growers between flocks. Generally speaking, hatchability bonuses were awarded to any grower who had greater than an 81.49% hatch rate and the feed bonuses were awarded to anyone who used less than 6.91 pounds of feed per dozen eggs.
Volentine received his first flocks (RR5) on December 17, 2004, and January 21, 2005. For these flocks, he received $8,035.35 and $10,341.03 hatch bonuses and $14,463.63 and $13,295.61 feed bonuses. He received flocks (RR7) again on December 15, 2005, and January 15, 2006. For those flocks, he received $8,996.40 and $8,845.20 in hatch bonuses and $2,570.40 and $2,527.20 in feed bonuses.
Coinciding with his receipt of his first flocks in late 2004, Volentine expended $200,000 in improvements to the farm including new nesting systems. He borrowed $145,000 in late 2004. By January 2005, Volentine’s level, of debt was $1,515,950. Volentine testified at trial that Raeford insisted on the investments for his houses in 2004, contrary to his understanding of the Contract.

New Raeford Management/Catastrophic Bird Losses—2007

|4Sam LeNarz became live operations manager of Raeford in February of 2007. The live operations manager supervises the breeder manager. In September of 2007, near the end or in between flocks, Kelly Garris became breeder manager for Raeford and was responsible for two service technicians who. visited the breeder farms. She supervised service technicians Ike Lipstom and Chris Ovitt. Ovitt serviced Volentine’s farm in 2007-2008. The service technicians visited the farms three times per week and prepared service reports.
Volentine’s third flock arrived on November 21, 2006, and December 15, 2006. For those flocks, he received $7,374.24 and $7,441.24 in hatch bonuses and $9,832.22 and $8,681.45 in feed bonuses. The flocks were sold on September 4 and 19, 2007. On May 11 and June 8, 2007, however, *334 Volentine experienced catastrophic bird losses (4,000-6,000 chickens) for these flocks due to electrical outages caused by-overheated breakers which were destroyed.
After the losses, Raeford “asked him” to replace all the main breakers on the farm. A meeting was held on June 22, 2007, to address the problems with Volentine. The Volentines, LeNarz, Garris, Chris Perry (former breeder manager) and Ovitt attended this meeting. Raeford expressed dissatisfaction with the feed system, bird disposal issues, waterline issues, and dirty eggs. A letter followed, documenting for Volentine the problems Raeford had with his farm. The need for a new alarm system was raised. Specifically, LeNarz indicated that “the farm alarm is a priority item.”
In a letter sent to Volentine by LeNarz, on August 22, 2007, Volentine was informed that “there has not been any progress” since the June meeting. |fiBy August of 2007, photographs of the farm were taken by Raeford in an attempt to document deficiencies.
Placement of Volentine’s next flock of birds was delayed due to the requested “routine maintenance items” that were not corrected by Volentine at the time of scheduled delivery of birds on- October 19, 2007. Additionally, no alarm system was installed at that time. Volentine called LeNarz on October 18, 2007, and the two engaged in a heated discussion about the delayed bird delivery. On October 19, 2007, Garris and LeNarz visited the farm and determined the farm was “not ready for birds.” A letter of November 13, 2007, from Garris to Volentine indicated that issues still, needed to be addressed.
Ultimately, Volentine alleged that he was required to expend $116,000 in improvements before getting his last flocks of birds on November 30, 2007 and January 4, 2008. To raise money for the improvements, Volentine sold a tract of land and all of his cattle. LeNarz and Garris visited the farm prior to the two bird placements.

Termination of Contract—2008

In February of 2008, Volentine admitted to having . labor problems. Dan and Dianne began to perform the work needed on the farm. Issues arose between Volen-tine and Raeford regarding certain farm bills that Raeford paid on behalf of Volen-tine. By . July 28, 2008, LeNarz sent a memo to Dennis Beasley, a principal owner of House of Raeford Farms, Inc., the parent entity of Raeford. LeNarz, informed Beasley that Volentine was “currently our worst producing farm.” Le-Narz also reported alleged | ^deficiencies on Volentine’s farm and proposed to “either buy him out or lease his farm,” to “avoid a potential lawsuit.”
On August 1, 2008, a meeting with Vo-lentine was held. Volentine, his son, Kevin, Wade Holloway (Volentine’s' banker), Garris, Ovitt and LeNarz were present. At the meeting, Volentine was told by Raeford that his Contract was being terminated. LeNarz refused to allow Volentine to sell or léase his farm to Kevin and gave him two weeks to determine if he “had a buyer or a lessee.” Volentine followed up with a letter to Garris, requesting that he not be taken out of the rotation for the next-flock. An October 2, 2008 letter from Raeford to Volentine formally terminated the Contract based upon Volentine’s alleged breach of contract. ■ These final flocks were sold oh September 3, 2008, and October 13, 2008. Volentine received feed bonuses of $4,734.72 and $3,545.10 and one hatch bonus of $4,734,72.
On July 24, 2009, Volentine sold his farm to Jeremy Wayne Gantt for $1,297,834.25,

*335
Trial Court Ruling

After considering the evidence and testimony, the trial court ruled in favor of Dan and Dianne Volentine, against House of Raeford Farms, Inc., and Raeford Farms of Louisiana, L.L.C., jointly and in solido, in the amount of $3,996,773.00 Additionally, the court awarded $391,219.40 in attorney fees. Generally, the court ruled that “Raeford abused its exténsive power by using the obligation to provide flocks of chickens as a ‘carrot’ to force Volentine to meet its ever-evolving, unwritten ‘company specifications’ which caused significant financial distress to the Volentines.” The Court 17noted that “after utilizing this unscrupulous tactic again in 2007, Raeford then internally decided to terminate the contracts,” and “required the upgrades that ultimately cost the Volentines $116,000 as demanded by Raeford.” The Court found that “at this point, Volentine was in a far worse position than before Raeford demanded the 2007 upgrades,” and that because of these actions, “Volen-tine was forced to liquidate his cattle herd and sell the Slaton and Watkins tracts to pay for the expenses associated with the upgrades.”
Specifically, the trial court made two findings of Raeford’s bad faith:
1) Raeford was guilty of a bad faith breach of contract for failure to timely provide flocks of chickens in 2007 and due to Raeford’s failure to provide technical advice regarding the capacity of the electrical breakers in violation of Section 1(B)(1) of the contracts.
2) Raeford terminated the contracts in bad faith in 2008.
The court specifically determined that despite Raeford’s claims that Volentine was a poor farmer and had caused Raeford economic loss, the evidence showed that Volentine’s issues were common to other farmers and that while Volentine was a below average farmer, he was not the worst. Regarding economic loss from the chicken losses of 2007, the trial court found that LeNarz did “not take into account that the lost hens had already produced the majority of their eggs at the time of loss.” It also rejected Garris’s testimony and found that LeNarz was angry with Volentine for reporting Raeford to Louisiana’s Commissioner of Agriculture in November of 2007.
The court rejected Raeford’s expert testimony regarding economic justification for termination of the Contract. Also the court considered that even before Raeford had removed the final flock from Volen-tine’s farm, |sLeNarz and Garris were in North Carolina recommending termination of the Contract based largely upon the 2007 pre-upgrade chicken losses.
The Court also found that the bad faith termination of the Contract by Raeford Farms violated LUTPA, and that the claim had not prescribed.

Damages

The court ruled that “Raeford’s wrongful conduct caused extensive damage to the Volentines.” For both the actions involving the bad faith breach in 2007 and failure to administer and terminate the Contract in good faith in 2008, the judge awarded the following damages, citing La, C.C. art. 1997, the law allowing an award of lost profits, and La. C.C. art. 1998. The Court also cited the “actual damages” and attorney fee provisions of LUTPA.
(A) Forced Sale of Properties and Resulting Taxable Capital Gains—$638,004:
(1) $64,666 (representing difference between value of Slaton Tract in July 2014—$138,500 and what was received in the 2007 sale)
(2) $246,465.71 (difference between what was received for sale of family land and value in July 2014—$1,544,300)
*336 (3) $326,872.59 (capital gatas taxes on sale of farm and tract to Gantt)
(B) Economic Loss Related to Poultry Operations—$296,489:
(1) $125,611 (past income losses from 2009-2014 included 2009 egg price raise to 38.5$ per dozen eggs)
(2) $170,878 (future income losses 2015-2023)
(C) Income loss for Cattle—$1,920,399
(D) Tax bunching Damages— $325,882.54 (14.7% of $2,216,888—the total losses for cattle and poultry operations)
(E) Recovery of Improvements— $316,000:
(1) $200,000—2005—initial expenditures
(2) $116,000—2007—improvements
(F) General Damages—$500,000 (pain, suffering, humiliation, mental anguish— $250,000 each to Dan Volentine and Diane Volenttae)
|9(G) Attorney Fees—$391,219.40 (for LUTPA violation)
The trial court’s award for cattle income loss requires further explanation. The award of $1,920,399, testified to by plaintiffs’ expert, represented the estimated lost income experienced by Volentine from 2008-2023, due to his loss of 150 head of cattle on 312 acres of land. Volenttae had raised cattle on the land since he acquired it. He began with a dairy farm in 2002, but maintained a small cattle business on the land that included 179.21 acres of pasture land. In 2007, 41.11 acres of the property was sold to Slaton and Volenttae liquidated 150 head of cattle to raise the money for upgrades.
The court awarded the lost cattle damages to Volentine after finding that Rae-ford abused its power and utilized unscrupulous tactics in the year 2007 to require $116,000 in upgrades before chickens would be provided. Because the court determined that these bad faith tactics forced Volentine to sell the cows and part of the property where the cows were located, he awarded the lost cattle income as damages.
It is from this judgment that Raeford has appealed raising various assignments of error and arguments. Raeford first contends that the trial court erred in rejecting Dr. Thomas Elam’s expert economic justification testimony evidencing good faith in Raeford’s termination decision. Next Raeford urges error in the trial court’s liability determinations regarding bad faith breach, administration and termination of the contract and that a LUTPA violation had occurred. Specifically, Rae-ford contends that LUTPA claims arising over one year prior to the suit are per-empted or ] ^prescribed. Raeford also urges error in the entirety of the trial court’s damage awards and LUTPA attorney fee award. Finally, Raeford argues that the trial court erred in finding House of Raeford Farms, Inc., solidarity liable with Raeford Farms of Louisiana, Inc.

Discussion

In Volentine I, we rejected Raeford’s claim of a contractual right to terminate the Contract at will and without cause. Reviewing Civil Code Articles 1770 and 1776 for the termination of contracts “for continuous and periodic performance,” we found that termination was proper only upon a showing of Raeford’s good faith and that material issues of fact regarding its 2008 termination of the Contract precluded summary judgment. Issues surrounding Raeford’s 2008 termination of the Contract remain for resolution in this appeal. We will first address issues not involved in Volentine I, concerning the trial court’s award of damages for Raeford’s actions under the Contract in 2004- and 2007. This appeal also requires review of *337 Volentine’s claims under LUTPA which were not addressed in Volentine I.
I.
Chronologically, the first contractual damage award by the trial court was for the $200,000 that Volentine expended in 2004, after the execution of the Contract. Volentine’s renovation of the nesting systems coincided with the receipt of the first Raeford flocks.
While Volentine testified that he was not aware of a requirement for this large expenditure when he entered the Contract, there was no evidence [uthat Volentine specifically objected to Raeford, his new integrator, that such requirement amounted to a contractual violation or overreach by Raeford.
On appeal, Raeford argues that Vo-lentine’s purchase of the new nesting system and his total $200,000 in expenditures did not result from an “unscrupulous tactic” to “force Volentine to meet” company specifications. Rather, Raeford argues that the evidence shows that Volentine wanted the system for the improvement of his farm.
The language of the Contract regarding equipment requirements, admittedly, is not detailed. The farm facilities were to be “fully equipped as required by Company specifications.” “New proven equipment” could be expected over time under the Contract given the parties’ obligations for their continuous and periodic performances throughout their intended lengthy relationship. The trial court construed these provisions of the Contract as requiring Raeford to submit written specifications for equipment improvements. Nevertheless, we find that Raeford’s communication to Volentine in 2004 regarding new equipment was sufficient and did not result in a breach of the new Contract at that time. Whether viewed as a requirement or recommendation by Raeford, Vo-lentine did not register his objection that this was beyond the meeting of minds for the Contract which had just been entered. Indeed, the petition for this action filed in 2009 made no allegation of fact regarding the $200,000 expenditures at the inception of the parties’ Contract. We find no proven breach of contract in 2004, and reverse the trial court’s $200,000 award for damages.
II.
| ^Similar to the 2004 claim, Volen-tine asserts that Raeford used unwarranted pressure upon him in 2007 to require $116,000 in farm expenditures following the 2007 electrical failures and chicken losses.[2] The trial court recognized as Raeford’s breaches of the Contract its wrongful imposition of this expenditure .requirement and- Raeford’s failure to have provided technical support to prevent the electrical overload. These breaches of the Contract were also determined to have occurred in bad faith, causing a forced liquidation of Volentine’s cattle and certain acreage, used for his cattle business, to raise funds. Thus, the trial court awarded $116,000 in damages for the forced improvements and $1,920,399 for the lost cattle operations and future income.[3]
An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective per *338 formance, or delay in performance. La. C.C. art. 1994. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La. C.C. art. 1995.' An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made. La. C.C. art. 1996. An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. La. C.C. art. 1997.
Bad faith is an intentional and malicious failure to perform. This includes most of the meaning of the French dol. La. C.C. art. 1997, Revision Comment (c). The term bad faith means more than mere bad judgment or negligence and it implies the conscious doing of a wrong for dishonest or morally questionable motives. Voletine I, supra at 753, citing MKR Services, L.L.C. v. Dean Hart Const., L.L.C., 44,456 (La.App.2d Cir.7/8/09), 16 So.3d 562; Bond v. Broadway, 607 So.2d 865 (La.App. 2d Cir.1992), writ denied, 612 So.2d 88 (La.1993).
The catastrophic losses of birds in 2007 were caused by “back to back breaker failures in the electrical station on the farm.” On May 11,' the breakers overheated and melted causing a power shut-off to one of the houses. Volentine did not discover the problem until the following morning. Of his 10,000 birds, 2,000-3,000 were lost. Again, on June 8, 2007, another bird loss occurred due to a breaker being thrown. The loss was “very similar” to the prior one. Volentine did not have alarm systems in the houses because they were not required. Even so, according to Volentine, the alarm systems would not have saved the birds because the generator melted and failed. Volentine did not know of any other farmers that had alarm systems or transfer switches on generators at the time. Raeford never informed Vo-lentine before the incident that his breakers were not big enough or might be a problem.
A June 27 meeting between Volentine and LeNarz followed the bird losses. Vo-lentine and his wife determined that they were to attend the meeting to discuss “equipment changes.” Volentine told Le-Narz that they could “probably get our hands on” $50,000-$60,000 and that “we would spend that much.” LeNarz documented the meeting in Exhibit P-5. In the document, LeNarz indicated that Vo-lentine “changed the breaker” on the 114first house and that he would “replace the 100 AMP with at least 125 or better than.” LeNarz also expressed concern to the Volentines about their management habits. LeNarz documented that the loss to Raeford due to the catastrophic bird losses was $112,000 and that Volentine was going to lose $12,000 because of the two events. He indicated that “the farm alarm is the priority item.”
An August 22, 2007 letter from LeNarz to Volentine identified the specific problems discussed at the June meeting and provided a list of deficiencies. Volentine acknowledged receipt of the document. The letter indicated that during an August 17, 2007 visit to the farm, only the two main breakers had been changed. Notably, two “old breakers were running in excess of 150° F,” which was “in the failure zone for this type of breaker.” The letter claimed that since the June meeting, “there has not been any progress.” It stated that “the management on this farm is nonexistent,” and that the future placement of birds with Volentine was “in jeopardy.” Raeford demanded that all “items on the attached list must be corrected 4 weeks after your birds are sold.” The list included a new generator and automatic transfer switch, main breaker replacement, and a new alarm system. Additionally, the list included repairs to or cleaning of water *339 lines, cool cells, lights, feed lines, egg rooms, and other facilities. ¡
Volentine also introduced a letter dated May 26, 2009, from LeNarz to all contract producers indicating that in the past two years “there have been twelve (12) catastrophic events within our operation,” where “particular contract producers have lost an excessive amounts of birds due to loss of power or some power related event.” In the letter, LeNarz indicated that the [1S12 events “have caused Raeford Farms to suffer the loss of 6,000 breeder hens and 187,000 broilers.” The letter indicated that it was the prior policy of Raeford to require an alarm system only after a catastrophic loss, but Raeford was changing its policy to require all producers to have alarm systems by July 3, 2009. The letter stated that the failure to follow the policy “could result in a delay of placement of your next flock or possible termination of your contract with the Company.”
In support of his claim for the 2007 expenditures, Volentine listed “a sampling of’ certain invoices of his expenditures in Plaintiffs’ Exhibit 7. There were only three invoices which primarily related to repairs as follows:
Dutchman chain feeders (3 houses) $62,386.49
Curtain with new cable (1 house) 1,820.85 New generator 17, 440.00
$71,646.34
Significantly, there was no invoice listing the cost of the new alarm system, and Volentine did not state the cost in his testimony. Additionally, upon cross-examination, Volentine was shown and identified D-50, the defense’s computation of Volen-tine’s expenses from June through November of 2007, totaling $86,393.20. In addition to the three invoices submitted by Volentine, this exhibit included 8 additional invoices to show that Volentine had not proven he spent $116,000. Those additional invoices did not include any invoice for the cost of the new alarm system. Finally, the record reveals that the 41-acre tract of land (the Slaton tract) was sold by Volen-tine on November 19, 2007, for $73,843. The value received for 150 cows which were also sold was not placed in evidence.
11fiFrom this review of the evidence of the 2007 expenditures by Volentine, the trial court’s award of $116,000 appears unsubstantiated. As to the initial question of Raeford’s breach of the Contract, Raeford could seek Volentine’s performance of his obligation “to provide housing and equipment well maintained and fully equipped as required by Company specifications.” All “requirements” set forth in LeNarz’s August 22, 2007 letter find some support from this language in the Contract expressing the producer’s duties and obligations. These requirements could amount to “specifications” within the meaning of the Contract, unless much more technical details were needed to inform Volentine about equipment which Raeford deemed to be required under the Contract.
Again, it is significant that Volentine did not object to Raeford about most of the improvements. In fact, at trial, Volentine testified that in 2007, the houses “could use some work” and “needed some improvement.” The major dispute centered on Raeford’s demands for the new alarm system. Volentine arguably was singled out by the company when other breeder and broiler producers wére not. Nevertheless, the cost of that system was not $116,000 and apparently may have only been a small portion of the $116,000 claim.[4] There was no specific showing by Volen- *340 tine that all of the other repairs and the new generator were unnecessary.
A doubtful provision of a contract must be interpreted in light of the conduct of the parties' before and after the formation of the contract. La. C.C. art. 2053. In this case, Volentine appears to have conceded the fact |17that certain repairs in 2007 were necessary. We find no breach of the Contract for the large amount of expenditures documented in the record. Additionally, the proof of the cost of the alarm system was-required.
The trial court’s additional ruling that Raeford breached its contractual duty for technical support causing the electrical failures of 2007 was based upon the following language of the Contract:
B. Services Provides by Company
The Company agrees to provide the following services at no cost to the Producer:
1. Technical Advice. The Company advisors shall visit the Producer periodically to give .advice and assistance as required.
Three other listed services to be provided by Raeford following this “Technical Advice” are “Catching and Marketing,” “Feed Delivery” and “Egg Pick-Up.” Therefore, in this contractual context, the services owed by Raeford pertained to the chicken management of the farm and were carried out by the periodic visits of the service technician.
The record does not reflect that the Raeford service technicians were routinely involved in a technical review of the electrical installations for the Volentine farm either at the beginning of the Contract in 2004 or thereafter. The “advice and assistance” owed by Raeford under the Contract are broadly stated concepts, but the parties’ practice in performing under the Contract does not support the trial court’s finding of a breach of contract for Rae-ford’s failure to give technical support for Volentine’s electrical installations. Moreover, the specific portion of Volentine’s $116,000 damage claim relating solely to the electrical failure was not clearly proven.
11sFrom this review of the Contract language, the circumstances surrounding the electrical catastrophe of 2007, and the parties’ dispute over Volentine’s expenditures, we first find that the trial court’s finding of a bad faith breach of contract in 2007 was error. Raeford’s position as reflected in its August 22, 2007 letter could be asserted in good faith from the language of the Contract pertaining to the duties and obligations of Volentine. Replacement of electrical breakers and the generator was necessary. Other repairs to the chicken facilities may have been necessary for “well maintained” housing of the birds, and Volentine, both by his actions in 2007 and his proof at trial, did not significantly contest those matters. The plaintiffs’ focus on Raeford’s position for the alarm system failed to clearly identify the burden of its cost. Finally, Raeford’s delay in supplying the new flocks to Volentine was a matter of six weeks from October 19, 2007, to November 30, 3007, as the parties remained in dispute. Accordingly, we cannot find that in the summer and fall of 2007, Raeford intentionally and maliciously failed to perform under the Contract without any arguable basis for its contractual demands placed upon Volentine for the reciprocal performance of his obligations.[5]
In summary, we do not find a bad faith breach of the Contract by Raeford in 2007. *341 This is distinguished from Raeford’s termination of the' Contract which occurred in 2008, discussed below. For the 2008 termination of the Contract, Raeford’s actions in 2007 in singling out h 3Volentine for the alarm system and its reaction to Volen-tine’s reporting to the Commissioner of Agriculture were relevant considerations in the trial court’s separate findings regarding bad faith in the termination of the Contract and the LUTPA violation. Finally, even if we assume that a breach of the Contract occurred in good faith because of the cost imposed on Volentine for the new alarm system, the amount of the resulting damage was not proven.[6]
Accordingly, the trial court’s award of damages of $116,000 for Volentine’s farm expenditures in 2007 is reversed. The bad faith damage award in the amount of $1,920,399 for the sale of Volentine’s cattle and loss of cattle income is also reversed, along with the $64,666 in damages awarded for the 2007 sale of the Slaton tract.[7]
III.
Following our review of the law in Vo-lentine I concerning the termination of a contract “for continuous or periodic performance,” the trial court found that in 2008, Raeford improperly terminated the Contract in bad faith. The legal principles governing the termination of a contract “for continuous or periodic performance” were set in Volentine I, as follows:
From our review of the Civil Code’s provisions on obligations and contracts, we find that the nature of the parties’ Contract falls in the category of contracts “for continuance and periodic performance,” See, La. C.C. arts. 1776, 1975, 2019, and 2024. The object of the Contract is not unlike the “output or requirements” contracts defined |gnin Article 1975. Although there are other aspects to the Contract, each party entered this agreement understanding that quantities of eggs would be required for the .ongoing future needs of Raeford’s poultry business and that Volentine’s output of that product was dedicated for delivery and sale to Raeford. Certainly, Volentine’s intent for a continuous and periodic performance from Raeford under the bilateral contract contemplated an agreement of future duration extending to allow a return on the sizeable fixed investment required of him under the Contract.
The Civil Code’s articles for the contract for continuous or periodic performance have specific provisions regarding the termination of such contracts. Article 1776 contemplates that the contract may be subject to a resolutory condition. Article 2024 provides in its suppletive law for termination similar to Paragraph 16 of the parties’ Contract, as follows:
A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party.
La. C.C. art. 2024. Finally and most significant, Civil Code Article 1770 addresses the exercise of a resolutory condition depending on an obligor’s will, as follows:
*342 A resolutory condition that depends solely on the will of the obligor must be fulfilled in good faith.
La. C.C. art. 1770.
Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith. La. C.C. art.1983. Good faith shall govern the conduct of the obligor and the obli-gee in whatever pertains to the obligation. La. C.C. art. 1759. The term bad faith means more than mere bad judgment or negligence and it implies the conscious doing of a wrong for dishonest or morally questionable motives. MKR Services, L.L.C. v. Dean Hart Const,, L.L.C., 44,456 (La.App.2d Cir.7/8/09), 16 So.3d 562; Bond v. Broadway, 607 So.2d 865 (La.App. 2d Cir.1992), writ denied, 612 So.2d 88 (La.1993). Bad faith is an intentional and malicious failure to perform. Revision Comment (c), La. C.C. art. 1997. The determination of whether a party acted in bad faith is a factual issue. N-Y Associates, Inc. v. Board of Com’rs of Orleans Parish Levee Dist., 04-1598 (La.App. 4th Cir.2/22/06), 926 So.2d 20, writ denied, 06-0666 (La.5/26/06), 930 So.2d 31; Weeks v. T.L. James & Co., 626 So.2d 420 (La.App. 3d Cir.1993), writ denied, 630 So.2d 794 (La.1994). Cf. Miller v. Conagra, Inc., 08-0021 (La.9/8/08), 991 So.2d 445.
lailn Revision Comment (f) to Article 1770, an at-will termination provision of a contract is addressed as follows:
[A] “termination at will” clause in a contract of long duration may be a fair clause properly bargained for or a trap set by the party with the greater bargaining power. The requirement of good faith stated in the second paragraph of this Article affords the protection needed by the victimized party in the latter kind of situation, and gives the courts necessary discretion to decide when to invoke it.
[[Image here]]
In order to comply with- the requirement of good faith, a party exercising his right to terminate a contract at will should consider not only his own advantage, ■ but also the hardship to which the other party will be subjected because of the termination. Thus, a party to a requirements contract that chooses to terminate it because he has án opportunity to sell'the same things elsewhere at a higher profit could violate the good faith requirement if the other party cannot find an alternative source of. C.C. art. 1770, Revision Comment (f).
Professor Litvinoffs commentary further discussed these contracts of long duration, as follows:
Modern law is aware of the distinction between contracts giving rise to obligations that are performed in just one act, whereby the parties bind themselves for a short term, and contracts giving rise to continuous relations between the parties for a long term. In contemporary terminology the expression ‘transactional ventures’ designates contracts of either instantaneous or, short term performance, while the expression ‘relational ventures’ has been coined to mean contracts entered in order to govern the parties’ relations for a long time.
Saul Litvinoff, Force Majeure, Failure of Cause and Théorie de L’Imprévision: Louisiana Law and Beyond, 46 La. L.Rev. 34-35 (1985). He concluded by emphasizing the duty of good faith, as follows:
The overriding duty of good faith that the parties owe themselves reciprocal *343 ly is thus enhanced in contracts of long duration. The emphasis is displaced from the individual end pursued by each of the parties to the end pursued in common by all of them, as if the contract were a joint-venture where the idea of opposed interests yields to the idea of a certain union of interests among the parties.
Id., 46 La.L.Rev. at 37.
Volentine I, supra at 752-754.
Additionally, regarding the proof of intent, circumstantial evidence can obviously play a significant role. Jurisprudence establishes that circumstantial evidence alone can prove retaliatory motive. See, e.g., Nicholson v. Transit Mgmt. of Southeast La., 00-0706 (La.App. 4th Cir.2/14/01), 781 So.2d 661, writ denied, 01-0721 (La.5/11/01), 792 So.2d 735 (relying solely on circumstantial evidence to find workers’ compensation retaliatory discharge). Likewise, proof that a defendant provided a false justification for an adverse action is strong circumstantial evidence of a discriminatory purpose. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 134, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
Raeford’s formally stated reasons for terminating the Contract were set forth in its October 2, 2008 letter to Volentine, as follows:
You have breached your contractual duties under the terms and conditions of your Hatching Egg Production Contracts in numerous ways. In May, 2007, you had one house lose power and you did not have a battery in your back-up generator. As a result of this power outage, 3,000 hens were smothered. Again, in June, 2007, another house on your farm lost power and'you did not have a battery in your back-up generator. This incident again resulted in a loss of approximately 3,000 hens. As a result of these catastrophic losses, Rae-ford Farms suffered economic losses totaling approximately $120,000.00. On June 22, -2007, Raeford Farms held a meeting with you to discuss your farming operation. At that meeting, we outlined our concerns over your substandard farming, operations and our concerns with your farm management. You were given a list of deficiencies to be corrected before any more birds would be placed on your farm. By August of 2007, it was apparent that you had not addressed your farm’s management problems, nor had you corrected the outlined deficiencies. On August 22, 2007, you were informed in writing that Raeford Farms would terminate your contact • if you did. not correct your farm’s deficiencies and management problems.
Since that time, you have continued to breach your contractual obligations by operating your farm in a substandard manner. Raeford | ¡.¡¡Farms has repeatedly informed you of problems with birds being fed, eggs being gathered, lighting in the houses, water line issues, cooling cell issues, and fans. You have continuously failed to remedy these problems despite being warned that your contracts would be terminated if these, deficiencies were not corrected. Also, in the contracts you agreed to properly dispose of dead birds, manure and poultry litter in accordance with government regulations and Raeford Farms’ recommendations.' You have been informed on several occasions that Raeford Farms observed violations with regard to your disposal of dead birds. You have chosen to ignore these warnings and have consistently failed to dispose of dead birds in an acceptable manner. In the contracts, you also agreed to use your best efforts to maintain the breeder hen flock in such a manner that *344 maximum egg production and hatchability would result. You have not fulfilled this obligation, as your egg production has consistently been below our 'acceptable farm average.
While this termination letter' occurred near the end of Volentine’s management of the final two flocks in 2008, on July 28, 2008, the company had internally reflected on Volentine’s farm in a report from Le-Narz, Garris, Ken Qualls[8] and Dennis Beasley. The report called Volentine’s operation “our worst producing farm.” It stated that Volentine had “historically been a below average producer,” and that the “farm is atrocious.” The report noted that Volentine’s current “production at 55 weeks of age is below the standard by 13.9 eggs per hen.” It stated that “we have just paid his electric bill for him so to avoid the power company turning off his power.” LeNarz further indicated that Volentine was “a terrible money manager,” and was “selling his cows to make ends meet each month.” The document further noted that “[w]e feel certain he is on the verge of bankruptcy.” Finally the letter suggested that “we offer to either buy him out or lease his farm,” in order to “avoid a potential lawsuit.” The document also indicated that Raeford could “shut him down and take the next batch of birds” to a [^company in Arkansas. The writer indicated that “one of these three options we must employ.”
Upon viewing the letter, Volentine denied that Raeford had to pay his electric bill to avoid having the power cut off and insisted that he was not the worst producing Raeford farmer. Based upon Exhibit D-32, the Hen Recap Report, listing the historic data for all breeder farms since 2004, Volentine’s ranking overall for his 4~ year production, does not reveal him to be the “worst” producer. In Garris’s testimony, she agreed that out of the 57 flocks of all breeders from 2004-2008, Volentine ranked sixth out of the nine farmers.
Volentine testified that it was untrue that he had to sell cows each month to pay bills, but sold cows to pay for the required 2007 renovations. Volentine conceded to having dirty egg problems but explained that was during the time he had employee issues. He identified an inspection report by Garris on May 20, 2008, in which she indicated that the egg collection rooms were clean.
Contrary to the above Raeford assessment, Volentine presented the testimony of Chris Ovitt, the Raeford service technician, who had left the company in 2008. Specifically, Ovitt visited Volentine’s farm twice a day, five days a week, and would prepare a report once a week. He made sure birds were getting fed and maintained in normal condition, and he evaluated egg production. Ovitt knew Volentine well. He inspected Volentine’s breeder farm from 2004 until September of 2008. Ovitt was questioned | Mabout his documented visitation reports specifically regarding Volentine’s last two flocks. He did not think Volentine was properly disposing of dead birds every day, although he did not mention this in his reports. During the last flock, Ovitt documented several times that the birds looked good.
Ovitt testified that in his personal opinion, Volentine’s contract should not have been terminated based upon what he saw on the farm. He felt that the farm was salvageable under the “right management.” He did not “personally” feel that Volentine’s operation was so poor that it *345 merited termination. Ovitt was not aware of any other Raeford farmer who had his contract terminated for poor management. He stated that feeding, egg gathering, water and lighting issues were common problems on chicken farms. Ovitt understood that Raeford, at its sole discretion, could require upgrades to a farm and, if these upgrades were not made, he believed that birds could be withheld.
On cross-examination by Raeford, Ovitt recognized problems through the year with Volentine’s farm that were not minor, indicating that the farm was mismanaged. Nevertheless, when confronted with his earlier deposition testimony in the case, he reiterated that he did not think Volentine was a bad manager.
Shortly after Raeford’s July 28 internal report on the Volentine farm, Volentine and Diane were called to a meeting at the Raeford headquarters in Arcadia. Most significant at this meeting is that Raeford had taken the liberty of calling in Volen-tine’s loan officer, Wade Holloway, of First Guaranty Bank, to attend the meeting.
|2fiIn Holloway’s testimony, 'he identified himself as the point man for Volentine’s loan, but not the main loan officer because he had returned to First Guaranty in early 2008. He confirmed his attendance at the August 1, 2008 meeting and admitted he never had a situation where the integrator asked him to attend a meeting. Holloway recalled that Garris invited him to the meeting and he. thought it was bizarre. Holloway understood that the purpose of the meeting was to inform Volentine that his farm was being shut down. The substance of the meeting gave Holloway concern. Before the meeting Garris called Holloway every couple of weeks complaining about the driveway and streaky cool cells. After the calls, or about five times, Holloway went to Volentine’s farm to do an inspection to check out the complaints. He then compared Volentine’s farm to others and did not see “anything out of the norm.” Everything seemed okay to Holloway. Holloway could not verify Garris’s accusations. He stated that Volentine’s farm was “obviously better than some of the others.” His cool cell problems were by no means the worst he saw; nor was his road. At the time of the August 1, 2008 meeting at Raeford, Holloway was not concerned with Volentine as a .credit risk and did not feel that foreclosure was imminent.
At the meeting, LeNarz told Volentine that they were terminating the Contract. Volentine had no idea this was going to happen. He recalled that they told him that he had to sell or lease his farm within two weeks, including his house and the poultry houses. They refused to allow him to sell the farm to his son and told him that “nobody named Volentine could run that farm.” Volentine felt that LeNarz did not like him and did not give ⅛⅛ a reason for not allowing his son to take over the farm. According to Volentine, Kevin was in the top third of broiler farmers.
At the time of the meeting, Volentine still had chickens on his farm and had two to three more months before they were sold. After the meeting on August 19, 2008, Volentine sent Garris a letter. Vo-lentine testified that Garris had called him about what he was doing with the farm. He responded with the letter requesting that Raeford not terminate his contract.
In the trial court’s written reasons for judgment, it made factual findings of circumstantial evidence of Raeford’s bad faith in terminating the Contract in 2008. The court listed the indications of bad faith as follows:
a) Terminating the contracts after chicken losses that occurred before Rae-ford demanded the $116,000 in upgrades;
*346 b) Inviting the banker, Holloway, to the termination meeting to humiliate and embarrass the Volentines;
c) Imposing an unreasonable and impractical two week deadline for the Vo-lentines to sell or lease their chicken houses and eliminating any Volentine family member as a potential candidate;
d) Terminating the contracts on the basis of the 2007 chicken' losses when these losses were due to Raeford’s failure to provide' technical support as required by the contracts;
' e) Terminating the' contracts on the basis of poor management/performance when Raeford paid Volentine 15/16 production bonuses from 2005-2008, including 3 out of the 4 bonuses available for the final two flocks;
f) Terminating the contracts on the basis of poor management/performance considering that other farmers performed similarly or worse and were not terminated;
g) Terminating Volentine’s contracts based upon the 2007 chicken losses considering that Raeford had lost 187,000 broilers on other farms during this same time and did not terminate any other contracts;
h) Terminating the contracts based on minor, common issues typical to oth7 er similar poultry farming operations;
i) Refusing to allow Volentine to sell the farm to his son Kevin based upon a prohibition against a producer being both a breeder and broiler at the same time, when Raeford later approved the sale of Volentine’s farms in 2009 to Gantt who owned a breeder farm;
j) Terminating the contracts without economic justification at the time of the termination.
li>sNotably, .in discussing Raeford’s bad faith breach, the trial court also found that LeNarz “became angry at the Volentines for reporting Raeford’s actions in withholding flocks to Bob Odom, then Louisiana Commissioner of Agriculture, who then contacted LeNarz’s supervisor and sent investigators to Volentine’s farm.” Additionally, the .trial court found that Raeford “singled out the Volentines, and used them as an example to other Raeford producers.”
Raeford first argues that it properly terminated the Contract in good faith, and that the trial court improperly dismissed the expert testimony of its economist, Dr. Thomas Elam. The trial judge rejected this testimony on the grounds that Raeford did not have, or rely upon, the information concerning Elam’s economic loss calculations at the time Raeford terminated the Contract. The court also found Elam to be biased in favor of Rae-ford and therefore gave very little weight to his testimony.
Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly wrong. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). Where the factfinder’s conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell, supra.
*347 Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073, opinion reinstated on reh’g, 95-0939 (La.11/25/96), 682 So.2d 239. This language places the responsibility of determining which expert was more credible on the trial judge. , Id. A trial court may evaluate expert testimony by the same principles that apply to other witnesses and has great discretion to accept or reject expert or lay opinion. The weight to be accorded to testimony of experts depends largely on their qualifications and the facts upon which they base their opinions. Boone v. Top Dollar Pawn Shop of Bossier, LLC, 50,493 (La.App.2d Cir.2/24/16), 188 So.3d 1093; Madison v. Thurman, 32,401 (La.App.2d Cir.10/27/99), 743 So.2d 857.
Elam identified a purported economic loss experienced by Raeford due to Volen-tine’s mismanagement and poor production. For the year 2008, Elam estimated that Raeford lost $161,550 from Volentine’s mismanagement practices. He arrived at this figure by including the sum of $94,538 as a cost for replacement eggs spent by Raeford in 2008. Elam’s information identified a total of 609,694 eggs that proved in poor condition from Volentine’s 2008 flocks. Nevertheless, we find no independent evidence in the record establishes that fact.
From our review of all information, we find the $94,538 claim unsupportable, or at least never clearly explained. Using the Contract rate | anof 32$ a dozen, the breeder producer received 2.7$ per egg. First, the value of 609,694 replacement eggs at 2.7$ per egg is approximately $16,500 from that perspective, and even when taking into account Raeford’s payment to Volen-tine for the.609,694 eggs, the cost of replacement .would be much less than $94,538. .
Most importantly, it is unclear from Elam’s testimony how this figure of 609,-694 eggs differs from eggs that were expected to be lost from Volentine’s 5,676,912 eggs delivered to Raeford in 2008. Given the “hatchability” bonus threshold of 81.49% for the hatch rate, 18.51% of Volentine’s eggs, or 1,050,796 eggs, might be expected never to produce new chickens in 2008. While we recognize that Volentine received only one hatch bonus in 2008 for one of his two flocks' with a reported hatch percent of 83.81%, the other flock had a hatch rate of 80.51% according to the Hen Recap Report. Therefore, we find much contradictory data which allowed the trial court to reject Elam’s claim for -this $94,538 loss.
Further, in arriving at his total loss amount,’ Elam compared “like farms” with the Volentine’s farm to the 2008 hatch, but failed to identify the source of the “like farm” information. Thus, the source of Elam’s conclusions is questionable. It is from these numbers that Elam' determined the total performance loss attributed to Volentine and then ultimately with cost adjustment, the net cost claimed by Rae-ford was $161,550.
Finally, Volentine’s expert, Benjamin Miller, also reviewed the Hen Recap Report. From his testimony, Miller concluded that in light of the 2004-2009 breeder farm total production, Volentine’s flocks remained “slightly below average compared to all 57 flocks” produced by the breeders |a, reviewed on the report. Thus, the trial court’s rejection of Elam’s testimony is supported by the record.
We also find that the Contract was improperly terminated. Before reaching the issue of bad faith, we find that the trial court’s conclusions first show no rea *348 sonable and good faith justification for Raeford’s July 2008 conclusion about the Volentine farm. Despite the fact that the 2007 flocks suffered from the electrical-related losses, Raeford effectively had moved on from those events and continued under the Contract into the future, content with Volentine’s significant capital improvements to his operation. Moreover, Raeford paid Volentine $33,829.15 in feed .and hatch bonuses for the 2007 flocks. Nevertheless, as shown from the October 2, 2008 termination letter and admitted by Garris, the 2007 electrical-related losses were the central justification given by Rae-ford for termination of the Contract.
Additionally, as emphasized by the trial court, the July 2008 termination decision was made long before the final harvest of eggs from the 2008 flocks. With this Contract for a continuing performance by the parties, Raeford was required to fulfill its bargain under the Contract to allow the 2008 flocks to be fully produced and additionally to allow Volentine to attempt to recover his recent 2007 investment.
Finally, the 2008 flocks earned Volentine total bonus payments of $13,014.54 for the “hatchability” and “feed conversion” efforts. The trial court could easily reject Raeford’s loss claim since these economic bonuses for Volentine’s 2008 farming efforts, which resulted from efficiency performance standards in the Contract, were earned at the same time that |32Raeford alleged suffering of great economic loss from the Volentine farm. Elam’s testimony, as discussed above, may be viewed as based upon unsubstantiated data and an after-the-fact economic analysis which is belied by Raeford’s award of the Volentine bonuses in 2008.
Turning to the issue of bad faith, we also find that the trial court’s stated findings of fact justified its conclusion of bad faith. There are multiple indications within its fact holdings that circumstantially show that Raeford’s agents singled Volentine out, were angry with him, and pursued a pattern of wrongdoing against Volentine with dishonest and morally questionable motives. We find most egregious Rae-ford’s inclusion of Volentine’s bank representative, Holloway, in the August 1, 2008 meeting in which Raeford aimed to immediately push Volentine out of the operation of his breeder farm. Raeford’s abrupt announcements at the meeting obviously disturbed the standing of Volentine’s separate contract of loan with his bank. Therefore, Raeford used the pressure of Volentine’s creditor upon the situation to enhance its position taken at the August meeting to remove Volentine and obtain a replacement breeder farmer in two weeks. Such business practice is reprehensible and egregious. While we single this instance out, the trial court’s recognition of the large body of evidence circumstantially indicative of Raeford’s morally questionable motive for the Contract’s termination is a fact determination that was not clearly wrong or manifestly erroneous.
Accordingly, we affirm the trial court’s determination that Raeford’s abrupt termination of the Contract in 2008 was a bad faith breach of the Contract.
[[Image here]]
Raeford next asserts that the trial court erred in its award of damages. The first damage award pertains to Volentine’s loss of his home and farm. In 2009, because of his farm indebtedness, he was forced to sell the farm for $1,297,834.25.
Raeford disputes the real estate values and damages awarded in connection with the 2009 sale of the Volentines’ family land, home and breeder farm houses. This was based upon the expert testimony of Henry Wilbanks, an expert in real estate appraisals, including poultry farming *349 properties. The Volentines received $1,297,834.25 in the 2009 sale. Raeford asserts that the price received in 2009 was a fair market price and that Wilbanks’s presentation of the appraised value of $1,544,300 represented the- 2014 value. The difference, which was awarded by the trial court, $246,465.71, represented the increased value over five years.
The issue presented concerns the application of the measure of damages for a bad faith breach of contract under La. C.C. art. 1997. The Article states:
An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.
Referencing this Article, Professor Litvi-noff has observed “that there is a point beyond which no cause-effect relation between fault and damage can be found unless fairness, and also common sense, are disregarded. Determination of that particular point depends to a great extent on the evaluation that a court makes of a given situation. It should be clear that | Msuch a determination is the prerogative of the trier of facts.” 1 Saul Litvinoff, Obligations § 5.24, at 138, in 6 La. Civil Law Treatise (1999).
Foreseeable damages are such damages as may fall within the foresight of a reasonable man. In distinguishing foreseeable from unforeseeable damages, the court should consider the nature of the contract, the nature of the parties’ business, their prior dealings, and all other circumstances related to the contract and known to the obligor. Any special circumstances made known to the obligor by the obligee should also be taken into account. La. C.C. art. 1996, Revision Comment (b).
With this understanding of the measure of damages for a bad faith breach of contract, we recognize that the loss of the Volentines’ home was not the most direct damage which was expected or foreseen at the time of the parties’ Contract. The Contract encompassed the benefit to Vo-lentine of farming income, the loss of which, upon Raeford’s - breach of the Contract, would cause the damage expected by the parties. With that view, the loss of the breeder farmer’s home would represent damage that was less direct. Nevertheless, Raeford’s revenues and payments owed to Volentine were being paid in part to Volentine’s bank as a security protection for the bank. With that close connection, we find that. Volentine’s loss of income caused his inability to service the loan indebtedness against his home and farm, which the trier-of-fact' could determine to be a direct consequence of Raeford’s bad faith breach under Article 1997.
When we examined Volentine’s loss of the home and family farmland, the record reflects that the $1,297,834.25 gained from the sale went to satisfy Volentine’s indebtedness. Insteád of Volentine earning | .^income under the Contract, servicing his loan indebtedness, and retaining the ownership and use of his property, he lost that use and ownership and received no benefit from the $1,297,834.25 and the continued use of credit. Likewise, without speculation of the future values of the land, at the time of trial the value of the Volentine farm had increased $246,465.71. The trial court chose to award that amount as the damage award for the bad faith breach under La. C.C. art. 1997. We do not find that this measure of the damage award under Article 1997 involved circumstances that were so remote as to be clearly wrong or manifestly erroneous. The damage award is affirmed.
The trial court also awarded $326,872.59 in- damages, reflecting the amount Volentine owed in taxes because of the capital gains he realized on the sale of *350 the farm.[9] Raeford argues that it received information that this claim was going to be sought by Volentine the Friday before trial was to begin and that they were prejudiced by the late-disclosed claim which should not have been allowed under La. C.C.P. art. 1154. Further, Raeford argues that Volentine’s testimony alone, without documentary evidence of any nature, was insufficient to prove the claim.
During Volentine’s testimony, his counsel asked him how his receipt of the farm sales price impacted him regarding taxes. Volentine testified that when he prepared his tax returns, he “wound up still owing about $300,000.” He stated that he was still getting statements from the Internal ^Revenue Service and State of Louisiana indicating that he owed capital gains taxes.
Counsel for Raeford objected to the line of questioning, arguing that it was a late-disclosed claim that should not be allowed. Volentine argued that it was an element of damages based upon his loss of the property which caused the capital gains burden. The court noted the objection and allowed the testimony, saying that the objection would be considered in the weight given to the evidence.
Volentine then identified statements sent to him from the IRS and the State of Louisiana showing how much he owed for capital gains on the sale of the farm. The statements showed that Volentine owed $253,142.49 to the IRS and $73,730.10 to the State of Louisiana. Raeford objected again, arguing that the amounts owed for capital gains were not damages related to the poultry contracts. Again, the judge noted the objection. Volentine was not cross-examined on the issue.
It is within the discretion of the trial court to admit or disallow evidence subject to an objection |,abased upon the scope of the issues and pleadings and to determine whether evidence is encompassed by the general issues raised in the pleadings. Alaska S. Partners v. Baxley, 35,206 (La.App.2d Cir.10/31/01), 799 So.2d 680; Bass Enters. Prod. Co. v. Kiene, 437 So.2d 940 (La.App. 2d Cir.1983); Huhn v. Marshall Exploration, Inc., 337 So.2d 561 (La.App. 2d Cir.1976), writ denied, 339 So.2d 854 (La.1976).
The issue of Volentine’s loss of his family farm and the damages he suffered was clearly an issue noted in advance of trial. Considering the discretion afforded the trial court in allowing the presentation of evidence based'upon the scope of the issues, we find no error in the ruling by the trial court allowing the presentation of evidence by Volentine regarding the issue of capital gains damages.
Considering our determination that Raeford terminated the Contracts in bad faith, we find the capital gains damage award appropriate as the obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. ‘ While not an expert, Volentine clearly had firsthand knowledge of the tax amounts he owed as the result of the sale of his farm. He readily identified them in his testimony from statements he had received. Expert testimony was not required to aid in the understanding of this tax issue. Any lack of supporting documentation was subject to cross-examination and challenge by the defense. Accordingly, we find the award supported by the record.
*351 The final issue of damages concerns the trial court’s award for loss of farming income from the breeder operation. Raeford contests the validity of the expert opinion of Benjamin Miller, plaintiffs’ expert in forensic accounting. Miller, a certified public accountant, testified regarding his estimation of Volentine’s loss of poultry income as the result of the Contract termination from 2009-2023, as well as the negative tax impact (tax bunching effect) Volentine would sustain if he received a lump sum award for lost income.
The trial court accepted Miller’s opinion that Volentine would have experienced total loss of revenues of $125,611.00 from 2009-2014 (past income), and $170,878 from 2015-2023 (future income) or a total of 1⅛$296,489.00.[10] The court also accepted Miller’s tax bunching testimony and awarded the sum of $325,882.54[11] as tax bunching damages, an amount determined by Miller’s . calculation of 14.7% of $2,216,888.00 ($1,920,399, cattle income loss and $296,489, poultry income loss). The court ruled that the assumptions upon which Miller based his opinion were reasonable and proven by plaintiffs and attached “more weight to the testimony of Ben Miller,” after consideration of the conflicting expert testimony.
On appeal, Raeford questions Miller’s qualifications as a forensic accounting expert, arguing that he was not a business evaluation expert qualified to make such profit projections, Raeford argues that in making the lost poultry income calculations, Miller gave only a cursory review of the Volentines’ tax returns, did not look at their debt-to-asset- ratio and relied on a list of assumptions given to him by plaintiffs’ counsel. Raeford argues that Miller merely plugged the assumptions into a calculation and never confirmed all of the assumptions including the “critical assumption” that prior to the1 Contract termination, Volentine was operating in a break-even mode. Raeford contends that Miller failed to ■ consider Volentine’s tax returns, which showed actual and continuing losses. Raeford argues that Miller’s “optimistic theoretical assertion” of future profits was contradicted by evidence of Volentine’s past performance.
laaMiller calculated Volentine’s loss of farming income by multiplying Volentine’s 2 flocks per year by his annual dozen egg production per flock (261,690) and the contract egg price including a 4c per 'dozen egg increase instituted by Raeford after Volentine’s contract termination. Miller discounted this total using a 2% discount rate. Raeford contests both the annual production amount and the discount rate used by Miller. Raeford argues that the Hen Recap Report showed that on his last four flocks,- Volentine had an average of 240,543 dozen eggs; on his last two Volen-tine averaged 236,539 dozen- eggs. Rae-ford argues that Miller did not include increased costs in his calculations or any expenses. Raeford finally contends that *352 the 2% discount rate was not based upon an independent analysis of Volentine’s poultry operations. Raeford ultimately argues that Miller’s estimations were speculative, based upon unsupported assumptions and improper methodology.
Loss of profits must be proved with reasonable certainty and cannot be based on speculation or conjecture. Simpson v. Restructure Petroleum Mktg. Servs., Inc., 36,508 (La.App.2d Cir.10/23/02), 830 So.2d 480; Clark v. Ark-Lar-Tex Auction, Inc., 593 So.2d 870 (La.App. 2d Cir.1992), writ denied, 596 So.2d 210 (La.1992). Furthermore, a claim for lost profits cannot rest solely on the testimony of the injured party without being substantiated by other evidence. Simpson, supra.
Here, we find no merit to Raeford’s argument regarding Miller’s qualifications. Miller was qualified as an expert forensic accountant and set forth his qualifications on the record. It was within the trial court’s broad |4ndiscretion to accept his qualifications as an expert in economic loss calculation, and we find no abuse of discretion in this ruling.
Next, we find no merit in Rae-ford’s argument regarding the reliability of Miller’s expert conclusions regarding Volentine’s poultry loss. Relating to his assumption that Volentine averaged about 261,690 dozen eggs per flock, we find that ample evidence exists to support his use of that number. During his testimony, Miller was asked about the annual production rate of 261,690 dozen eggs per flock he used in his calculation. The expert testified that he performed an independent calculation of this amount from the Hen Recap Report. This calculation revealed that this rate was below the actual average of Volentine’s dozen eggs per flock of 265,-000. He nevertheless utilized the 261,690 because it “was within range” and “reasonable.” Thus, the record shows that Miller independently evaluated this assumption and reasonably relied upon it in his calculations.
Finally, regarding Miller’s use of a 2% discount rate, he testified that he verified the reasonableness of the assumption based upon his knowledge that the discount rate ranged “anywhere from 1.8 to 2.7.” Thus, in Miller’s opinion, 2% seemed reasonable. The trial court was within its discretion to accept Miller’s discount rate.
Overall, we find the trial court’s credibility determination regarding Miller’s expert opinion and calculations to be supported by the record. Considering that, as noted above, his assumptions were reasonably supported by the record, the trial court abused no discretion in giving greater weight to Miller’s conclusions.
141 Raeford also takes issue with Miller’s tax bunching calculations arguing that there is no precedent for tax bunching damages. Raeford argues that Miller’s tax bunching conclusion improperly mixes a pre-tax analysis and after after-tax analysis and is unsupported by the facts, the evidence and the law.
Miller testified that he was asked to calculate “the negative tax impact” that Volentine would incur if he received a lump sum award for future income as opposed to receiving payments or annual income over a period of time. He understood that the tax bunching concept was referred to in the case of Miller v. Conagra, supra.
Miller utilized his poultry loss and cattle loss calculations in arriving at the tax bunching total. He multiplied the total losses by 14.7% percent, utilizing this percentage after his review of tax tables. Miller arrived at a total tax bunching sum of $357,470.00. He noted that in the event *353 that Volentine received a sura less than either of his loss calculations, the 14.7% could be used for any large lump sum award.
We find no error in the tax bunching award. As in the case of the capital gains taxes, the negative tax impact resulting from the lump sum judgment is a direct consequence of the bad faith breach of contract by Raeford.
Because, however, we have determined that Volentine is not entitled to the lost cattle profits, the tax bunching calculation will apply only to the lost poultry profits of $296,489.00, for a sum of $43,584.00. The judgment will be amended accordingly.
V.
Next, Raeford argues that Volentine failed to prove a violation of LUT-PA. Raeford argues that there is no evidence of “the conscious doing of a wrong for dishonest -or morally questionable motives.” Raeford contends that because no LUTPA claim was established, the $500,000 mental anguish award and $391,219.40 attorney fee awards should be reversed. Further Raeford argues that the mental anguish award to Diane was erroneous as she was not a party to Rae-ford’s Contract with Volentine. In the alternative, Raeford contends that any LUTPA claims arising over one year prior to the filing of suit on September 23, 2009, were preempted/prescribed.[12]
The Louisiana Unfair Trade Practices Act defines violations of its provisions as follows:
A. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
La. R.S. 51:1405(A).
Acts constituting unfair or deceptive trade practices are not specifically defined but are determined on a case-by-case basis. Gandhi v. Sonal Furniture & Custom Draperies, L.L.C., 49,959 (La.App.2d Cir.7/15/15), 192 So.3d 783, writ denied, 15-1547 (La.10/23/15), 184 So.3d 19; Johnson Const. Co. v. Shaffer, 46,999 (La.App.2d Cir.2/29/12), 87 So.3d 203; Tyler v. Rapid Cash, LLC, 40,656 (La.App.2d Cir.5/17/06), 930 So.2d 1135. Only egregious actions involving elements of fraud, | ^misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA. LUTPA does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes. Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc., 09-1633 (La.4/23/10), 35 So.3d 1053; Ghandi supra. It has been held that recovery of general damages is available under LUTPA. These include damages for mental anguish and humiliation. Gandhi, supra; Slayton v. Davis, 04-1652 (La.App. 3d Cir.5/11/05), 901 So.2d 1246; Laurents v. Louisiana Mobile Homes, Inc., 96-976 (La.App. 3d Cir.2/5/97), 689 So.2d 536; Vercher v. Ford Motor Co., 527 So.2d 995 (La.App. 3d Cir.1988). A LUT-PA violation also results in an award for attorney fees. La. R.S. 51:1409(A).
From our conclusion above concerning Raeford’s bad faith termination of the Contract, the trial court’s determination of egregious and unethical conduct in Rae-ford’s dealing with Volentine also amounts *354 to a violation of LUTPA. Thus, the attorney fee award is affirmed.
We also find the award of mental anguish damages under LUTPA to be supported by the record before us. Damages for mental anguish have been sanctioned under LUTPA. Gandhi, supra. The standard of review applicable to a general damages award is the abuse of discretion standard. Bouquet v. Wal-Mart Stores, Inc., 08-0309 (La.4/4/08), 979 So.2d 456; Anderson v. Welding Testing Lab., Inc., 304 So.2d 351 (La.1974). Vast discretion is accorded the trier of fact in fixing general damage awards. Bouquet, supra. An appellate court may disturb a damages award only after an articulated analysis of the facts reveals, an abuse of discretion. Bouquet, supra; Youn v. Maritime Overseas Corp., 623 So.2d 1257, (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
In this case, the evidence showed that the farm had been in the Volentine family for over a generation, purchased by Volen-tine’s father. As such, the land held great emotional value to the family. Dan testified about the grief he experienced in having to tell his father he had lost the land and his lifelong plans of keeping the land in his family. Further, in various capacities, the property had been used for Volen-tine’s livelihood and as the place where they had raised their family. The evidence established that the loss of the land and farm had affected Dan physically and caused Diane great emotional upheaval. Considering the testimony establishing the great emotional toll that the termination of the Contract had on the Volentines, we find no error in the award of $250,000 each to Dan and Diane Volentine for extreme emotional pain, suffering, mental anguish and humiliation.
We also -find no error in the award of $250,000 mental anguish damages to Diane, despite the fact that she was not a party to the Contract. An obligation incurred by a spouse during the existence of a community property regime for the common interest of a spouse or for the interest of the other spouse is a community obligation. La. C.C. art. 2360. Community property includes damages awarded for loss or injury to a thing belonging to the community. La. C.C. art. 2338; Tippen v. Carroll, 47,415 (La.App.2d Cir.9/20/12), 105 So.3d 100. Property acquired and income earned during [ 4Rthe existence of the legal regime through the effort, skill or industry of the spouses are community property. La. C.C. art. 2338.
Raeford presented no evidence to rebut the presumption that the Contract was a community obligation. Diane’s labor and industry were expended under the Contract. As such, damages awarded for breach of the Contract belonged to the community, and the LUTPA general damage award flowing from the Contract transaction was also appropriately awarded to Diane.
VI.
In their final assignment of error, Raeford argues that the trial court erred in finding House of Raeford (“House”) solidarity-liable with Raeford Farms of Louisiana. Plaintiffs alleged that Raeford Farms and House operated as a single business enterprise and/or are alter egos of the other and liable in solido. Raeford argues that there was no single business enterprise/alter ego evidence offered at trial and plaintiffs failed to show commingling of funds, disregard of statutory formalities or any other evidence to prove this claim.
Raeford correctly contends that the trial court made no specific finding of fact on *355 this issue. However, in the final judgment, the court rendered judgment against both Raeford Farms and House, in solido. After a review of the record before us, we find this to be in error.
The “single business enterprise” doctrine is a theory for imposing liability where two or more business entities act as one. Generally, under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for | ^wrongful acts done in pursuit of that purpose. Brown v. ANA Ins. Grp., 07-2116 (La.10/14/08), 994 So.2d 1265, citing, Green v. Champion Ins. Co., 577 So.2d 249 (La.App. 1st Cir.1991), writ denied, 580 So.2d 668 (La.1991).
Generally, under this doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose. Brown, supra; Coleman v. Burgundy Oaks, L.L.C., 46,314 (La.App.2d Cir.6/8/11), 71 So.3d 352. Where two or more corporations operate a single business, the courts have been unwilling to allow affiliated "corporations that are hot directly involved to escape liability simply because of the business fragmentation. Green, supra; Town of Haynesville, Inc. v. Entergy Corp., 42,019 (La.App.2d Cir.5/2/07), 956 So.2d 192, writ denied, 07-1172 (La.9/21/07), 964 So.2d 334.
Whether or not two or more entities comprise a single business enterprise is a factual determination to be decided by the trier of fact and is subject to the manifest error standard of review. Town of Haynesville, supra.
In determining whether a corporation is an alter ego, agent, tool or instrumentality of another corporation, the court is required to look to the substance of the corporate structure rather than its form. The following factors have been used to support an argument that a group of entities constitute a “single business enterprise”:
1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;
2. common directors or officers;
|473. unified administrative control of corporations whose business functions are similar or supplementary;
4. directors and officers of one corporation act independently in the interest of that corporation;
5. corporation financing another corporation;
6. inadequate capitalization (“thin incorporation”);
7. corporation causing the incorporation of another affiliated corporation;
8. corporation paying the salaries and other expenses or losses of another corporation;
9. receiving no business other than that given to it by its affiliated corporations;
10. corporation using the property of another corporation as its own;
11. noncompliance with corporate formalities;
12. common employees;
13. services rendered by the employees of one corporation on behalf of another corporation;
14. common offices;
15. centralized accounting;
16. undocumented transfers of funds between corporations;
17. unclear allocation of profits and losses between corporations; and
18. excessive fragmentation of , a single enterprise into separate.corporations.
*356 These factors are similar to factors that -have been used in Louisiana “piercing the veil” cases. This list is illustrative and is not intended as an exhaustive list of relevant factors. No one factor is dispositive of the issue of “single business enterprise.” Green, supra. The party seeking to disregard the corporate shield must show the exceptional. circumstances which merit piercing the corporate veil. Shoemaker v. Giacalone, 34,809 (La.App.2d Cir.6/20/01), 793 So.2d 230, writ denied, 01-2614 (La.12/14/01), 804 So.2d 632.
The only facts offered as proof in the record linking Raeford Farms to House of Raeford include the similarity in names, two common managing officers, and a meeting between the common managing officers and Qualls and Beasley that occurred at the company headquarters of House of Raéford in North Carolina. Thus, only one factor of the total eighteen listed in Green, supra, has been satisfied. This is insufficient to satisfy the plaintiffs’ burden of proof under the relevant jurisprudence. The trial court was manifestly erroneous in holding House of Raeford solidarily liable -with Raeford Farms. We therefore reverse this portion of the judgment.

Conclusion

We affirm in part and reverse in part the trial court’s judgment against Raeford Farms of Louisiana, LLC. The trial court’s judgment holding House of Raeford liable is reversed. The damages affirmed by this court are as follows:
$246,465.71 for the damages suffered on the forced sale of the family farm;
$326,872.59 for the capital gains tax loss related to the sale of the family farm;
$296,489.00 for the loss of revenues/income (past and future) owed by Raeford following the termination of the Contract;
$45,584.00 for the tax bunching damages;
$500,000 ($250,000 each to the Volentines) for general damages;
$391,219.40 for attorney fees;
Total Damages and Attorney Fees = $1,804,630.70
The other damages comprising the trial court’s total damage award of $3,996,773.00 are reversed or modified as set forth above. The amount of attorney fees is increased by $15,000 for this appeal.
Costs of this appeal are assessed to Rae-ford Farms of Louisiana, LLC.
AFFIRMED IN PART; REVERSED IN PART.

. Breeder farmers receiye birds from the integrator’s breed farms. The chickens are placed in the breeder houses for the purpose of producing eggs. The eggs are sent to a hatchery and the baby chicks produced are sent to broiler farms.

. Volentine’s petition alleged that in 2007 he "questioned LeNarz as to why he was forced to spend the $116,000,” and was threatened with the withholding of further flocks.

. For the 2007 bad faith breach, the court also awarded $64,666 in increased value of the Slaton tract sold for the 2007 upgrades.

. In his testimony, LeNarz stated that the cost of an alarm system in 2007 was $4,000.

. Either party to a commutative contract may refuse to perform his obligation if the other has failed to perform or does not offer to perform his own at the same time, if the performances are due simultaneously. La. C.C. art. 2022.

. Also, the value of the farm and breeder houses reviewed below for the damages for wrongful termination of the Contract would include the value of the new alarm system, and is thus a part of the damage assessment for the sale of Volentine’s farm.

. As discussed above, Volentine showed that the value of the Slaton tract in 2014 was $64,666 more than the value received in the 2007 sale. The damages related to taxes discussed below will be adjusted to reflect the reversal of the cattle income award and the Slaton tract damage award.

. Qualls was the Interim Complex Manager of House of Raeford Farms of Louisiana, Area-dia.

. The trial court’s reasons for judgment appear to award capital gains damages for the sale of the Slaton tract. It is clear, however, that the award reflects only the amount- Vo-lentine claimed to owe in taxes due to the sale of the farm.

. Notably, a conflict exists between the trial court's ultimate calculation of poultry income .loss and Miller's testimony. While Miller used the sums of $170,878 and $125,611 in calculating his poultry income loss, upon questioning, his fln.al number was $314,028. However, the sum of these two amounts is $296,489, the amount awarded by the trial court. Raeford takes issue only with the fact that these amounts were awarded, rather than the specific calculations. Thus, with the error in Miller’s calculation apparent, we will accept the trial court's calculations.

. Because of the above-noted difference in the poultry loss amount, Miller’s tax bunching numbers were also different from the trial court's final award. Here also, Raeford takes issue only with the fact that these amounts were awarded, rather than the specific calculations.

. This included the value increase award for the Slaton tract and the cattle income.claim. Raeford does not argue that the damages from the 2009 breeder farm sale, tax awards, or the loss of poultry income were prescribed under LUTPA. Those claims arose within one year of the filing of this action. Therefore, the prescription assertion relating only to the 2007 claims, which we have reversed, is moot.