# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 12, 2021

Lyle W. Cayce
Clerk

No. 20-30225

WILLIAM EDWARD BROWN,

*Plaintiff—Appellant*,

*versus*

PHOENIX LIFE INSURANCE COMPANY,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:18-CV-478

Before HAYNES, HIGGINSON, and OLDHAM, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:*

This case concerns a contract dispute involving a life insurance policy purchased by Plaintiff-Appellant William Edward Brown from Defendant-Appellee Phoenix Life Insurance Company. Brown appeals the district court's dismissal of his Second Amended Complaint with prejudice pursuant

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 20-30225

to Federal Rule of Civil Procedure 12(b)(6). We AFFIRM in part, REVERSE in part, and REMAND for further proceedings.[1]

## I. Factual Background

As alleged in Brown's Second Amended Complaint, in December 1986 Phoenix[2] sold Brown a "universal life insurance policy" ("the Policy") with a $150,000 death benefit and a $1,200 annual premium. At the time of the sale, an insurance agent working for Phoenix allegedly represented to Brown that the Policy charged higher premiums, which—in addition to covering the immediate costs of the insurance—would be used to create and build an investment fund that would earn interest and be available to pay premiums later in life in order to provide "coverage for life." The agent described the investment fund model as differentiating the Policy from term life insurance.

To help demonstrate how the Policy would function, the agent provided Brown with a "Sales Illustration."[3] The Sales Illustration shows two different projections of the investment fund's accumulated value over time, with the variable inputs being the cost of insurance and the interest rate, and with an assumption of a steady $1,200 annual premium payment. One of the projections is based on a "guaranteed" interest rate of 4.5% along with a guaranteed cost of insurance. The other projection is based on an "assumed"

---

[1] Judge Haynes concurs in the opinion and judgment except as to Count Three. She would certify that question to the Louisiana Supreme Court.

[2] Phoenix assumed responsibility for the insurance policy at issue; the original parties to the transaction were Brown and Home Life Financial Assurance Corporation, Phoenix's predecessor-in-interest. For simplicity, we refer only to Phoenix when describing the involvement of either Home Life or Phoenix.

[3] While Brown did not attach the Sales Illustration to his Second Amended Complaint, Phoenix attached it to its motion to dismiss and the magistrate judge held that it could be considered because it was incorporated by reference into the complaint.

interest rate of 9.75% and the "current" cost of insurance. The projection based on the assumed 9.75% interest rate shows the value of the investment fund steadily growing through the end of year 30, where the table ends. The projection based on the guaranteed 4.5% interest rate shows that the value of the fund initially grows before it begins to decrease and eventually reaches zero in year 19. Accompanying the table is a note that reads: "[A]dditional premium will be required in month 7 of year 19 or policy will lapse, based on guaranteed factors."

The Sales Illustration also contains handwritten notes which allegedly "reflect what [Phoenix's] agent told Brown at the time of the sale." These markings include a note that states "can reduce premiums w/ cash value interest." Brown alleges that this note "records [Phoenix's] agent's representation that the investment fund (cash value) will be sufficient to reduce premiums in the future." Other notes state: "1200[,] 150 k," "50 whole + 100 term," and "5 yrs[,] 50 k." Brown alleges that the "1200" note records the agent's representation "that the annual premium will remain level at $1,200 per year" because the investment fund will pay additional or increased premiums later in life. He also alleges that the "50 whole" and "5 yrs[,] 50k" reflect the agent's representations that $50,000 of the $150,000 death benefit is whole life insurance which would be "paid up" after five years.

To finalize the purchase, Brown completed an "Application for Insurance," which described the "planned" monthly premium to be $100 and stated that the Policy would take effect "when the [P]olicy is delivered to the owner and the full first premium is paid." Brown paid the full first premium; however, he alleges that Phoenix failed to deliver the Policy.

In the decades following the purchase of the Policy, Brown continued to make $100 monthly premium payments. He also repeatedly reached out

No. 20-30225

to Phoenix to request a written copy of the original Policy. In total, he alleges that he made six written requests (along with multiple phone inquiries) for the Policy. For example, in a November 23, 1988 letter, Brown wrote: "This is my *third* request to [Phoenix] headquarters for my insurance policy. . . . I have not been able to obtain the policy from the agent or the company. Please send me the policy immediately." In August 2006, in response to another of Brown's requests for a copy of the Policy, Phoenix sent Brown a "Lost Policy Certificate."

On January 12, 2009, Brown sent another letter to Phoenix that stated: "Please send a copy of the agreement that authorizes Phoenix to increase the premiums and a copy of the premium schedule for past and future years. . . . As your files will show, I have never received a copy of the policy. All I have is a Lost Policy Certificate."

Phoenix responded in a letter dated February 6, 2009. The letter states that Brown's Policy "is a type of Universal Life Insurance . . . [that] is a combination of permanent insurance and an investment fund that provides coverage for the insured's entire life." It describes that the value of the investment fund "is determined by the accumulated premiums and interest earned, less the cost of insurance (at the insured's attained age), and administrative costs." The letter also states that the interest rate was 9.75% at the time the Policy was issued in December 1986, but that the current interest rate is 4.5% and the guaranteed interest rate is also 4.5%. It then advises: "It is important for you to remember that your policy is a premium paying contract and has reached a point where it required more than $100.00 monthly to support the death benefit. UL polices are flexible premium policies . . . and depend on prevailing interest rates to keep the accumulation account large enough to support the death benefit."

No. 20-30225

On August 3, 2015, Brown sent Phoenix another letter requesting, among other things, the policy provisions and standards Phoenix uses to determine premium increases, and the projected premiums for Brown's Policy over the next 10 years. Brown also noted, again, that he had never received the original Policy from Phoenix.

Phoenix replied in a letter dated August 17, 2015. The letter encloses an attachment, which is described as a "representative copy of the contract form" that shows the "current benefits and features" of Brown's Policy. The letter notes that the attachment is *not* "an exact duplicate of the original policy." Brown alleges that the document does not disclose "the amount of additional premiums or the reduction of the investment fund to zero."

Three years later, in response to Brown's further inquiries about possible premium increases on his Policy, Phoenix sent Brown an email (dated January 8, 2018), which contained an attachment showing a schedule of future premiums due on Brown's Policy. The schedule shows that in order to maintain the Policy—due to the increasing cost of insurance as Brown ages—Brown would need to pay additional premiums beyond the original $100 monthly payment. According to the schedule, in 2018 an immediate payment of $2,500 plus $100 monthly payments would be required to maintain the policy. Starting in 2019, an annual premium contribution of $11,321.04 would be required. Brown alleges that based on this schedule, "Phoenix required almost $140,000 in additional premiums to keep the $150,000 policy in force to age 85." He further alleges that these increased premiums violate Phoenix's "promise [that] the investment fund provides coverage for Brown's entire life with the $1,200 annual premium."

Separately in 2018, a Phoenix representative informed Brown that there is no delivery receipt for the Policy in Phoenix's files.

No. 20-30225

On February 12, 2018, Brown filed suit in Louisiana state court asserting a variety of contract law claims. Phoenix removed to federal court, asserting diversity jurisdiction. Upon Phoenix's motion, the district court dismissed Brown's First Amended Complaint for failure to state a claim but granted Brown leave to amend. Brown filed his Second Amended Complaint on April 25, 2019.

In his Second Amended Complaint, Brown's asserts ten different claims for relief, including breach of contract, bad faith breach of contract, failure to deliver the Policy, estoppel, and annulment and/or rescission of the contract. Brown's various claims appear to be premised on one of two alternative theories. Under one theory, the original written insurance Policy included terms that guaranteed that the Policy could be maintained so long as Brown made annual premium payments totaling $1,200 and therefore Phoenix breached the Policy by charging additional premiums beyond that amount, causing the Policy to lapse. Under the alternative theory, despite representing that the Policy only required $1,200 in annual premiums, Phoenix deceptively included terms in the Policy allowing it to charge additional premiums that would deplete the investment account and cause the Policy to lapse, and then failed to deliver the Policy or otherwise disclose those terms, thereby causing Brown to detrimentally rely on Phoenix's representations.

Phoenix again moved to dismiss under Federal Rule of Procedure 12(b)(6), and the motion was referred to a magistrate judge. The magistrate judge issued a report recommending that the district court dismiss all ten of Brown's claims with prejudice. Brown timely filed objections to the magistrate judge's report, to which Phoenix responded. The district court issued a one-page decision accepting the magistrate judge's recommendation, granting Phoenix's motion, and dismissing Brown's Second Amended Complaint with prejudice.

6

Brown filed a timely notice of appeal.

## II. Standard of Review

"We review de novo the district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (citation omitted). In reviewing the motion, we "must consider the complaint in its entirety," as well as "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *accord Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, 976 F.3d 585, 589 (5th Cir. 2020). All well-pleaded facts are accepted as true, *Tellabs*, 551 U.S. at 322, and are construed "in the light most favorable to the nonmoving party, 'as a motion to dismiss under 12(b)(6) is viewed with disfavor and is rarely granted,'" *Leal*, 731 F.3d at 410 (quoting *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)). "Dismissal is appropriate only if the complaint fails to plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Yet, the complaint must allege enough facts to move the claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

## III. Discussion

In a typical contract interpretation dispute, the parties agree on what the contract says but disagree about what it means. In other words, the parties produce the same contract containing the same language but offer up competing interpretations of that language. Phoenix argues that this is the situation we confront here.

In doing so, Phoenix defends a key assertion made by the magistrate judge in her opinion: construing Brown's complaint as treating the "representative copy of the contract from" as an accurate copy of the original, written Policy. The magistrate judge describes that Brown's

complaint quotes from the August 17, 2015 letter and that "[t]he enclosed insurance policy is mentioned in nearly every paragraph of the amended complaint." The magistrate judge then refers to that "enclosed insurance policy" (i.e., the "representative copy of the contract form") as the "written policy" throughout the rest of her opinion. And she describes Brown's complaint as alleging that Phoenix failed to deliver the Policy to him *until* August 17, 2015—the date the letter with the enclosed "representative copy of the contract form" was delivered to Brown.

Brown argues that the magistrate judge erroneously interpreted his complaint and failed to view the alleged facts in the light most favorable to him. He claims that his complaint alleges that Phoenix *never* delivered a copy of the original Policy and that the "representative copy of the contract form" is not an accurate, complete copy of the terms of the original Policy.

We agree. While the magistrate judge permissibly considered the documents as incorporated by reference into the pleadings, she erred by construing Brown's Second Amended Complaint as equating the "representative copy of the contract form" with Brown's use of the term "written policy" elsewhere in the complaint. In the paragraph of the complaint in which the "representative copy of the contract form" is first mentioned, Brown makes clear that he is directly quoting Phoenix—Phoenix describes the attachment to the August 17, 2015 letter as a "representative copy," not Brown. And in the only other two paragraphs of the complaint in which the "representative copy of the contract form" is mentioned, Brown—just as we do here—places the term in quotations, attributing the language choice to Phoenix. Nowhere does Brown allege that the "representative copy of the contract form" accurately represents the terms of the original written Policy, or that his widespread use of the term "written policy" should be taken as a reference to the "representative copy of the contract form." Furthermore, reading Brown's complaint as alleging that

No. 20-30225

Phoenix finally delivered a copy of the Policy to Brown on August 17, 2015 conflicts with his allegations that Phoenix *never* delivered the Policy. Taken on its face, especially when construed in the light most favorable to Brown, the Second Amended Complaint does not treat the "representative copy of the contract form" as an accurate representation or copy of the original written Policy.[4]

Thus, contrary to Phoenix's assertions and the magistrate judge's ruling, we do not have a written and undisputed copy of the terms of the original Policy in front of us for purposes of evaluating Phoenix's motion to dismiss. Instead, we have Brown's allegations describing the terms of the original written Policy. On this front, Brown's pro se complaint is not a model of artful pleading. Nonetheless, we construe Brown's Second Amended Complaint as alleging two alternative factual possibilities and theories of liability, both stemming from the alleged premise that Phoenix has denied him the opportunity to review the actual contents of the original written Policy by failing to deliver it to him (or to anyone else). The first theory is that the original written Policy does in fact guarantee that Brown's life insurance could be maintained so long as Brown made $1,200 in annual premium payments, and that therefore Phoenix breached the Policy by charging him additional premiums. The second theory is that Phoenix *represented* that the Policy contained such a guarantee, but then deceptively

---

[4] Indeed, in Brown's Objections to the magistrate judge's Report and Recommendations, he strenuously objected to the magistrate judge's decision to construe the "representative copy of the contract form" as an accurate copy of the original written Policy. He then moved to further amend his complaint to add an allegation explicitly denying that the "representative copy of the contract form" constituted an accurate copy of the original Policy. The district court adopted the Report and Recommendation without addressing Brown's Objections and the magistrate judge denied the motion to amend as moot.

No. 20-30225

included terms in the Policy that allowed it to charge additional premiums (causing the Policy to lapse), resulting in Brown's detrimental reliance.

As to the first theory, Brown alleges in various parts of his complaint that he entered into a written contract with Phoenix for a life insurance policy that covered his entire life and guaranteed a $150,000 death benefit so long as he paid a $1,200 annual premium. For example, in the section of his complaint seeking specific performance of the contract, Brown alleges that "[t]he contract of insurance contains the following enforceable terms: . . . [t]he contract of insurance remains in force as long as the $1200 annual or $100 monthly premiums are paid." Of course, having never seen the original written Policy himself, his allegations are based on evidence extrinsic to the Policy, such as the alleged representations of Phoenix's agent, the notes on the Sales Illustration, and Brown's interpretation of other documents provided by Phoenix, such as the February 2009 letter. While these extrinsic representations do not alter the clear terms of the contract as set out in the original written Policy, *see Peterson v. Schimek*, 729 So.2d 1024, 1031 (La. 1999), they may constitute evidence of the contents of the original instrument if the original is unavailable, LA. CODE EVID. art. 1004; LA. REV. STAT. § 13:3740; *see also Swaggart v. Doe*, 216 So.3d 1118, 1126 (La. Ct. App. 2017).[5]

As to the second theory, the Second Amended Complaint also contains several allegations that Phoenix included "undisclosed" terms in the original Policy which permitted it to charge additional premiums that would deplete the investment fund and cause the Policy to lapse, despite Phoenix's alleged representations to the contrary.

---

[5] In Louisiana, insurance contracts must be in writing. *La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1252 (La. 1993) (citing LA. REV. STAT. § 22:867 (formerly codified at § 22:628)).

Either the terms of the original written Policy permit the contested additional premiums, or they do not. It may turn out that Phoenix will be able to prove that the "representative copy of the contract form" is an accurate representation of the original Policy, despite Brown's allegations in the Second Amended Complaint. But the dispute over what the original Policy *says* (as opposed to what it *means*) is a dispute of fact that cannot be resolved at the motion to dismiss stage.

Just because there is a dispute of fact, however, does not mean that Brown has properly stated legal claims. We therefore take each of Brown's ten claims in turn and assess whether he has properly stated claims for relief.

### A. Count One

As his first count, Brown alleges that:

Phoenix breached the written policy by charging additional premiums that depleted the investment fund to zero at age 75, rendered the written policy unaffordable, uneconomic, and worthless, and caused the written policy to lapse in violation of the representations, purpose, and cause of the written policy of universal life insurance to provide "an investment fund that provides coverage for [Brown's] entire life."

Under Louisiana law, "[t]he essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 68 So.3d 1099, 1108-09 (La. Ct. App. 2011).

Brown has pleaded plausible facts establishing all three elements of a breach of contract claim under Louisiana law. As discussed above, Brown has alleged (as his first theory of liability) that the terms of the Policy established Phoenix's obligation to provide life insurance with a $150,000 death benefit

for Brown's entire life as long as he paid a $1,200 annual premium. Brown further alleges that Phoenix breached that obligation by charging him an additional $2,500 in 2018 and by planning to charge him a $11,321.04 annual premium starting in 2019, and that these increased premiums caused the policy to lapse and Brown to lose coverage.

The magistrate judge held that Brown failed to state a claim under Count One because his "allegations . . . are contradicted by the written terms of the policy, which controls." She then describes the terms as laid out in the "representative copy of the contract form" which purportedly governs. As explained, Brown's complaint does not allege that the "representative copy of the contract from" is the "written policy," and thus its terms do not govern for purposes of Phoenix's motion to dismiss. Phoenix's arguments on appeal also turn on the contention that the "representative copy of the contract form" constitutes the Policy and thus are similarly unavailing at this juncture.

We therefore REVERSE the district court's dismissal of Count One.

**B. Count Two**

In his Count Two, Brown alleges that "Phoenix breached the written policy by charging additional premiums that violated the 'guaranteed factors' limits on additional premiums" as set forth in the Sales Illustration. This allegation fails to state a claim for two reasons.

First, Brown does not allege that the Sales Illustration was attached to or incorporated into the original written Policy. Therefore, terms expressed in the Sales Illustration are not considered terms of the Policy. La. Rev. Stat. § 22:867(A) ("No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy . . . .").

Second, to the extent that Brown is alleging that the terms contained in the Sales Illustration constitute evidence of similar terms in the original written Policy, Brown does not describe what the "guaranteed factors" are that Phoenix purportedly violated. Looking at the Sales Illustration, its reference to "guaranteed factors" appears to encompass a "guaranteed interest rate" of 4.5% and a "guaranteed cost of insurance." Brown does not allege that the investment fund in his Policy was subject to an interest rate less than 4.5%. Nor does he allege what the "guaranteed cost of insurance" amounted to, or that the costs exceeded this guarantee.[6]

Therefore, we AFFIRM the district court's dismissal of Count Two.

### C. Count Three

In Count Three, Brown claims (based on his second, alternative theory of liability) that any provisions in the original Policy that would authorize additional premiums are unenforceable under Louisiana law "because the written policy was not delivered or mailed to Brown . . . and the alleged provisions were not otherwise disclosed to Brown."

In support of this claim, Brown cites to this court's decision interpreting Louisiana law in *In re Matter of Complaint of Settoon Towing, L.L.C.*, 720 F.3d 268 (5th Cir. 2013). He focuses on one sentence in the opinion, which states that: "[U]nder Louisiana law an insurer cannot take advantage of favorable policy terms where it delayed delivery of the policy after the insured payed the premium." *Id.* at 282 (citing *La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1253 (La.

---

[6] Brown also does not describe whether the "cost of insurance" is something different than the premium charged for his insurance coverage. Presumably, the "cost of insurance" is the projected cost to Phoenix of providing coverage to Brown, which is separate from what it charges Brown for that coverage (in the form of a premium).

1993)). Brown argues that this statement constitutes a holding that in Louisiana, "an undelivered policy is enforceable for the benefit of the insured . . . but the insurance company cannot take advantage of favorable policy terms."

However, when read in context, this court's statement in *Settoon* did not create a blanket rule that all terms favorable to the insurer are unenforceable when delivery of a policy is delayed; rather, this court merely reiterated a narrower rule that is well established in Louisiana law: that "[i]nsurance policy *exclusions* are not valid unless clearly communicated to the insured." *La. Maint. Servs., Inc.*, 616 So.2d at 1253 (emphasis added).

At issue in *Settoon* was whether an insurer could rely on a coverage exclusion related to liability for pollution when it had delayed delivery of the insurance policy to the insured. *Settoon*, 720 F.3d at 282. To answer that question, this court looked to the Louisiana Supreme Court's decision in *Louisiana Maintenance Services, Inc. v. Certain Underwrites at Lloyd's of London*, 616 So.2d 1250 (La. 1993). There, the Court considered whether an insurer could rely on a policy exclusion to deny coverage when it had failed to deliver the policy to the insured in violation of Louisiana Revised Statute § 22:873 (formerly codified at § 22:634). *La. Maint. Servs.*, 616 So.3d at 1252-53. Notably, § 22:873 does not specify a remedy; it states only that "every policy shall be delivered to the insured . . . within a reasonable period of time after its issuance." LA. REV. STAT. § 22:873(A). In determining that the insurer could not rely on the policy exclusion due to its failure to deliver the policy, the Court cited Louisiana case law emphasizing the requirement that insurance policy *exclusions* must be clearly communicated to the insured and the importance of the insured's notice of such provisions. *La. Maint. Servs.*, 616 So.2d at 1252-53 (citing *Spain v. Travelers Ins. Co.*, 332 So.2d 827 (La. 1976)). Relying on that discussion and holding, this court in *Settoon* held that "*Louisiana Maintenance Services* indicates delayed delivery in violation of

§ 22:873(A) is enough to prevent [the insurer] from relying on the pollution exclusion . . . ." *Settoon*, 720 F.3d at 282.

Brown cites no case law—and we are aware of none—where § 22:873(A) (or *Settoon*, for that matter) has been applied to prohibit an insurer's reliance on other policy provisions that are not coverage exclusions, such as a provision requiring an insured to pay premiums in exchange for continued coverage, while enforcing terms favorable to the insured. We therefore decline to adopt Brown's expansive reading of Louisiana law.

The district court's dismissal of Count Three is AFFIRMED.

### D. Count Four

In Count Four, Brown alleges that Phoenix committed a "bad faith breach of [the] written policy" by charging additional premiums that reduced the investment fund to zero at age 75 after Phoenix represented to Brown that the investment fund provided coverage for Brown's entire life.

Under Louisiana law, "[b]ad faith is an intentional and malicious failure to perform" a conventional obligation. *Volentine v. Raeford Farms of La., LLC*, 201 So.3d 325, 338 (La. Ct. App. 2016). "The term bad faith means more than mere bad judgment or negligence and it implies the conscious doing of a wrong for dishonest or morally questionable motives." *Id.* "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform," whereas "[a]n obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." *Id.* In sum, to hold a defendant liable for bad faith breach of a contract, a plaintiff must show that (1) the defendant consciously breached the contract (2) for dishonest or morally questionable motives. *See id.*

As discussed above with respect to Count One, Brown has satisfactorily alleged that Phoenix breached the written Policy by charging unauthorized, additional premiums. But Brown has not pleaded sufficient facts alleging that Phoenix consciously breached its obligations in bad faith. Brown only makes conclusory allegations that Phoenix perpetrated "an intentional sham and scam." This does not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Firefighters' Ret. Sys. v. Grant Thornton, L.L.P.*, 894 F.3d 665, 669 (5th Cir. 2018).

The district court's dismissal of Count Four is AFFIRMED.

**E. Count Five**

Brown asserts another claim for bad faith breach of the Policy in Count Five. However, this claim for relief is premised on his second theory of the case, in which Phoenix is alleged to have deceptively included "terms in the written policy that allegedly authorized [Phoenix] to increase premiums high enough to reduce the investment fund to zero by age 75" despite "representing to Brown that the higher premiums would create and build an investment fund to provide coverage for his entire life."

If, as alternatively alleged, Phoenix included terms that permitted it to charge the contested additional premiums, then it cannot be held liable for bad faith breach of contract because it has not breached the contract. As described above with respect to Count Four, bad faith breach requires the failure to perform. *Volentine*, 201 So.3d at 338.

The district court's dismissal of Count Five is AFFIRMED.

No. 20-30225

### F. Count Six

In Count Six, Brown claims that Phoenix's failures to deliver the Policy "violated Louisiana law," "breached an express or implied provision in the written policy," and breached "Phoenix's policies."

In his briefing, Brown disputes two aspects of the magistrate judge's opinion recommending dismissal of his claim in Count Six. First, he argues that the magistrate judge erred in construing his Second Amended Complaint as admitting that Phoenix performed its obligation to deliver the Policy on August 17, 2015. Second, Brown contests the magistrate judge's finding that Brown failed to allege any damages that flowed from the non-delivery (or late delivery, in the magistrate judge's telling) of the Policy. He argues that "the failure to deliver the policy caused [him] to buy the wrong policy and pay the higher premiums." He also argues that he suffered emotional distress and "loss of peace of mind" when he discovered in 2018 that the investment fund associated with his Policy had been depleted and that the Policy would be rendered "worthless."

As already discussed, we agree with Brown that his complaint is properly understood to allege that Phoenix has never delivered the Policy. But we disagree that the magistrate judge erred by concluding that Brown did not properly allege damages that flowed from the non-delivery of the Policy. Regardless of what he now asserts in his briefing before this court, no allegations of damages resulting from non-delivery of the Policy is found in his Second Amended Complaint with respect to Count Six.[7] *See Favrot*, 68

---

[7] Brown also does not describe how non-delivery of the Policy breached the Policy or other Phoenix "policies." In his First Amended Complaint, he alleged that Phoenix's failure to deliver the Policy violated the terms of the Application for Insurance and argued the Policy was therefore a nullity. But Brown does not repeat that claim in his Second Amended Complaint nor in his appellate briefing.

So.3d at 1108-09 (La. Ct. App. 2011) (describing that a breach of contract claim requires showing damages resulted from the breach). Nor does Count Six tie the damages complained of elsewhere in his Second Amended Complaint to the wrongs alleged in Count Six. Finally, Brown does not otherwise describe how non-delivery of the Policy violated "Louisiana law" in a way that states a claim for relief and affords a remedy.[8]

The district court's dismissal of Count Six is AFFIRMED.

### G. Count Seven

In Count Seven, Brown claims that Phoenix should be estopped from "charging additional premiums to reduce the investment fund to zero" because he detrimentally relied on multiple alleged misrepresentations and omissions by Phoenix regarding the terms of the Policy. These alleged misrepresentations and omissions include: (1) the failure to deliver the Policy, (2) oral misrepresentations by Phoenix's agent, (3) misrepresentations in the Sales Illustration, (4) the general failure to disclose to Brown that additional premiums would be charged, and (5) specific failures to disclose that additional premiums would be charged in the monthly premium notices, annual reports, and in the Lost Policy Certificate sent to Brown.

To establish detrimental reliance or promissory estoppel in Louisiana, a plaintiff must show "(1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Luther v. IOM Co.*, 130 So.3d 817, 825 (La. 2013). Moreover, the

---

[8] As discussed above with respect to Count Three, Phoenix's alleged failure to deliver the Policy states a violation of Louisiana Revised Statute § 22:873(A). But Brown does not identify or discuss that statute with respect to Count Six, nor does he explain what remedies are available here for its violation.

plaintiff must "reasonably" rely on the promise, which is typically a fact-bound determination. *Drs. Bethea, Moustakas & Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 403 (5th Cir. 2004) (citing *Babkow v. Morris Bart, P.L.C.*, 726 So.2d 423, 427 (La. Ct. App. 1998)). "However, Louisiana law recognizes certain situations where a plaintiff's reliance on a promise is unreasonable as a matter of law." *Id.* (citing *Gray v. McCormick*, 663 So.2d 480, 486 (La. Ct. App. 1995)).

Reliance may be unreasonable as a matter of law "when a plaintiff relies on oral representations despite the law's insistence on certain formalities." *Id.* at 405 (citing *Gray*, 663 So.2d at 486). In *Gray v. McCormick*, the Louisiana Court of Appeal held that a party's reliance on an oral promise to donate land was unreasonable as a matter of law because transfers of such property require "adherence to formal, written requirements provided by law" which the parties did not adhere to in forming their agreement. 663 So.2d at 486. More specifically, the Louisiana Supreme Court has held that "[a]bsent fraud, or at least affirmative misrepresentations as to the necessity of a writing, . . . it is almost always the case that it will be unreasonable to rely on an oral promise where the law requires such a promise to be in writing to be enforceable." *Morris v. Friedman*, 663 So.2d 19, 26 n.14 (La. 1995) (internal citation omitted).

In Louisiana, insurance contracts must be in writing. *La. Maint. Servs.*, 616 So.2d at 1252 (citing La. Rev. Stat. § 22:867 (formerly codified at § 22:628)). Therefore, to the extent Brown claims he justifiably relied on oral representations made by Phoenix's agent, that reliance was unreasonable as a matter of law. Likewise, Brown alleges that the handwritten notes on the Sales Illustration reflect the oral representations of Phoenix's agent. Thus, it was also unreasonable to rely on these notes.

No. 20-30225

As to the Sales Illustration itself (not including the handwritten notes), Brown claims that it omitted that additional premiums would deplete the investment fund to zero. But the Sales Illustration made no such omission or misrepresentation. On the contrary, the Sales Illustration explicitly stated that the investment fund would have a balance of zero in year 19 of the Policy if it earned only the guaranteed interest rate of 4.5%.

So too with the annual reports, which contain month-to-month detail. The notices show that Brown made steady $100 monthly premium payments. But they also show the cost of insurance was increasing as Brown aged and that the investment funds were being used to cover the difference between his $100 monthly contributions and the rising cost of insurance. They also reflect that the rate of growth of the investment fund was insufficient to keep up with the growing cost of insurance, so long as Brown continued to make only $100 monthly payments. Therefore, the annual reports do not contain a misrepresentation.

Brown's allegations with respect to the "monthly premium notices"—copies of which are not attached to the Second Amended Complaint or Phoenix's motion—are the same as his allegations involving the annual reports. He alleges the notices only reported his $100 monthly premium payments and did not disclose that "additional premiums were or would be charged in amounts to deplete the investment funds to zero." As with the annual reports, Brown has not explained how the monthly notices made a misrepresentation insofar as they accurately represented that Brown made monthly premium payments of $100. And if, unlike the annual reports, the monthly notices did not include detail about the rising costs of insurance or draws on the investment fund, Brown has not explained how that omission could induce his justifiable and detrimental reliance—especially in light of the fact that Phoenix *did* provide this allegedly absent detail in the annual reports. *Cf. Bethea*, 376 F.3d at 405 (explaining that reliance is unreasonable

No. 20-30225

as a matter of law "when a plaintiff relies on a representation that is clearly not intended to bind the defendant or induce the plaintiff into reliance" (citing *Miller v. Loyola Univ. of New Orleans*, 829 So.2d 1057, 1062 (La. Ct. App. 2002))). The same is true with respect to the Lost Policy Certificate. *See id.*

Finally, failure to deliver the Policy is not a misrepresentation in and of itself. Nor is Phoenix's alleged general failure to disclose that additional premiums may be necessary.

The district court's dismissal of Count Seven is AFFIRMED.

**H. Count Eight**

In Count Eight, Brown seeks specific performance of the Policy and alleges the specific enforceable terms of the contract. As described above, these allegations track Brown's first theory of liability that the original written terms of the Policy guaranteed, among other things, that the Policy would be maintained so long as Brown made $1,200 in annual premium payments.

Count Eight therefore rises and falls with Count One, where Brown alleges breach of these terms. *See Dore Energy Corp. v. Prospective Inv. & Trading Co.*, 570 F.3d 219, 230 (5th Cir. 2009) ("Under Louisiana law, 'specific performance is the preferred remedy for breach of contract.'" (quoting *J. Weingarten, Inc. v. Northgate Mall, Inc.*, 404 So.2d 896, 897 (La. 1981))).

We therefore REVERSE the district court's dismissal of Count Eight.

**I. Count Nine**

In Count Nine, Browns seeks, in the alternative, a declaration that the Policy is an "absolute nullity" under Louisiana Civil Code Article 2030

21

because Phoenix failed to deliver the Policy in violation of Louisiana Revised Statute § 22:873(A). He requests restitution in the form of all premiums paid.

Brown asserted a virtually identical claim for relief in his First Amended Complaint, which was dismissed by the district court. And, as the magistrate judge noted below, Brown made no specific argument with respect to Count Nine in his opposition to Phoenix's motion to dismiss.

Regardless, the district court below did not err in dismissing Count Nine. Article 2030 states that "[a] contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral." LA. CIV. CODE art. 2030. Brown cites no authority holding that § 22:873(A) is a rule of public order such that its violation renders a contract null. And as discussed above with respect to Count Three, while courts have declined to enforce insurance policy exclusions when an insurer fails to deliver a policy in violation of § 22:873(A), those same courts have not declared the relevant contracts null; rather, they enforced other provisions of the contract. *See, e.g.*, *Settoon*, 720 F.3d at 280-82.

The district court's dismissal of Count Nine is AFFIRMED.

**J. Count Ten**

In Count Ten, Brown alternatively seeks rescission of the contract for error or fraud, alleging that Phoenix fraudulently represented (and/or Brown erroneously believed) that the Policy would provide coverage for his entire life and could be sustained with $1,200 annual premiums.

"Consent to a contract may be vitiated by error, fraud, or duress." *Osborne v. McKenzie*, 962 So.2d 501, 503 (La. Ct. App. 2007) (citing LA. CIV. CODE. art. 1948). When that occurs, rescission of the contract is a potential remedy. *Id.* However, the action for rescission or annulment must be brought within five years of discovering the alleged error or fraud. *Id.*

(citing LA. CIV. CODE. art 2032); *see also Clark v. Constellation Brands, Inc.*, 348 F. App'x 19, 21 (5th Cir. 2009) (per curiam) (unpublished opinion).

Here, we agree with the district court that Brown's action for rescission fails. Assuming *arguendo* that Brown has alleged fraud or error that could give rise to the remedy of rescission, he has not sought this remedy within the applicable five-year window. That the Policy might require additional premiums to be paid in order to sustain the Policy was apparent from at least the time Brown received the February 6, 2009 letter from Phoenix.

In that letter, Phoenix described that the value of the investment fund "is determined by the accumulated premiums and interest earned, less the cost of insurance (at the insured's attained age), and administrative costs." After describing that the investment fund was currently earning an interest rate of only 4.5%, the letter starkly stated: "It is important for you to remember that your policy is a premium paying contract and has reached a point where it required more than $100.00 monthly to support the death benefit. UL polices are flexible premium policies . . . and depend on prevailing interest rates to keep the accumulation account large enough to support the death benefit."

In short, the 2009 letter alerted Brown to the alleged error or fraud by directly stating that the Policy would require additional premiums in order to be sustained. Because Brown did not bring this action until nine years later, his claim for rescission is too late.

The district court's dismissal of Count Ten is AFFIRMED.

**K. Brown's Motion to Supplement**

Brown also appeals the magistrate judge's decision denying his motion to supplement the Second Amended Complaint. Brown filed his motion in response to the magistrate judge's Report and Recommendation, before it

was adopted by the district court. While the motion was pending, the district court issued its decision granting Phoenix's motion to dismiss and dismissing all of Brown's claims with prejudice. The magistrate judge then denied Brown's motion as moot in light of the district court's decision.

Because, as explained above, we reverse the district court's decision to dismiss Counts One and Eight, Brown should be given leave to refile his motion to supplement.

## IV. Conclusion

The district court's decision granting Phoenix's motion to dismiss is AFFIRMED in part and REVERSED in part. The dismissal of Counts Two through Seven and Counts Nine and Ten is AFFIRMED. The dismissal of Counts One and Eight is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.[9]

---

[9] We recognize, as well, that further proceedings may yield more information about the actual, original Policy that was issued to Brown, and that such information could lead to additional claims. We offer no opinion on any such claims.